Terrell WALTERS and Joseph Ganci,
and All Others Similarly
Situated, Plaintiffs,

v.

Governor James EDGAR, Odie Washington, Keith Cooper, Dwayne A. Clark, Sergio Molina, Glenn Johnson, Thomas Page, Richard Gramley, George de Tella, and Peter E. McElhinney, Defendants.

No. 82 C 1920.

United States District Court,
N.D. Illinois,
Eastern Division.

Aug. 28, 1995.

James P. Chapman, James P. Chapman & Assoc., Chicago, IL, Alan Mills, Chicago, IL, for plaintiffs.

Wallace Cyril Solberg, Ill. Atty. Gen. Office, Chicago, IL, Carol L. O'Brien, Ill. Dept. Corrections, Chicago, IL, for defendants.

### MEMORANDUM OPINION FINDINGS OF FACT AND CONCLUSIONS OF LAW

BUCKLO, District Judge.

In *Bounds v. Smith*, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977), the Supreme Court reiterated that prisoners "beyond doubt ... have a constitutional right of access to the courts." *Id.* at 821, 97 S.Ct. at 1494. The Court in *Bounds* held that prisons must provide inmates with adequate law libraries or "adequate assistance from persons trained in the law" for this right to be meaningful. *Id.* at 828, 97 S.Ct. at 1498. This case presents the question of whether the Illinois Department of Corrections can satisfy its constitutional obligation to provide meaningful access to the courts to inmates in segregation in maximum security prisons who have no direct access to library books, and at least one third of whom are unable to read or comprehend legal materials, through what is essentially a runner system by which inmates are provided books and materials at their request.

Plaintiffs Terrell Walters and Joseph Ganci brought this class action against Illinois state officials alleging that inmates in segregation in Illinois maximum security correctional facilities are not allowed access to any prison library and that the inmate law clerk system employed in lieu of library access denies plaintiffs reasonable access to the courts in violation of their constitutional rights. Judge James Moran, to whom this case was assigned originally, certified a class consisting of all persons who are presently or will be in segregation in the maximum security facilities of the Illinois Department of Corrections. The case was later assigned to me.[1]

The trial in this case involved many witnesses from all five Illinois maximum security institutions as well as other officials from the Illinois Department of Corrections, non-employees, including experts in various fields and former officials, and inmates. Each side introduced hundreds of exhibits. The transcript covers some 6,000 pages. Following trial, the parties prepared proposed findings as well as supplemental briefs on various issues. There have been numerous supplemental hearings with regard to the evidence. The parties have also submitted additional evidence in response to questions raised during the trial and hearings, and during my consideration of the evidence.

This opinion constitutes my findings of fact and conclusions of law.[*] For the most part, the evidence as to each institution will be considered separately. While the institutions have in common the fact that, as plaintiffs allege, no prisoner in segregation is allowed direct access to any library, there are numerous differences with respect to the substitute system in effect at each institution. Although each utilizes inmate law clerks to help prisoners, there are major differences in terms of the number of inmate law clerks assigned to help inmates in segregation and the type of help they provide.

At two of the institutions in this case, Joliet and Pontiac Correctional Centers, the evidence showed that inmates are unable to be assured of acquiring materials such as copies of cases despite changes made by defendants during the long course of this

---

1. The parties had begun trial of this case before Judge Moran when it was reassigned to Judge James Alesia. Judge Alesia declared a mistrial. After settlement discussions broke down, the case was reassigned to me, originally by consent when I was a U.S. Magistrate Judge. It was reassigned to my calendar as a U.S. District Judge on my appointment to the district court.

* Due to the length of the proceedings and the amount of evidence, I have earlier provided the parties with proposed findings of fact and con-clusions of law. Each side was given the opportunity to submit objections to findings. I have reviewed the objections and made changes where I thought they were appropriate. If I have not made a change pursuant to an objection, it is because I have considered the proposed change and specifically concluded that it is not supported by the evidence, which includes the record as a whole and my determination of credibility of witness testimony. In this opinion, I have referred to only a few of these objections.

case. At both of these institutions, and at Menard Correctional Center, defendants failed to demonstrate that inmates who need assistance in preparing complaints or other pleadings will be provided that help. The evidence also showed that one third or more of the inmates in any Illinois prison are illiterate and unable to understand legal materials, and would be incapable without assistance of preparing a complaint that could withstand a motion to dismiss. I conclude that defendants are not providing inmates in segregation at Menard, Joliet or Pontiac Correctional Centers with reasonable access to the courts.

## FINDINGS OF FACT **

### The Plaintiff Class

■ 1. The class certified by Judge Moran in 1985 consisted of all persons who are presently or will be in segregation in the maximum security facilities of the Illinois Department of Corrections. Persons in segregation status include not only inmates sentenced or "assigned" to terms in segregation and who are in the segregation units of the various prison facilities, but also persons detained in segregation during an "investigation" into whether they have violated rules of the Department of Corrections and persons in segregation status who are physically confined in cells outside the segregation unit because of overcrowding.

■ 2. After this case was reassigned to me, defendants sought modification of the class, arguing that prisoners with short stays in segregation would at most suffer a *de minimis* denial of their right of access to the courts. I agreed with defendants that a *de minimis* denial of access to the courts had not been accorded constitutional protection under prevailing authority [2] and proposed a tentative modification of the class to exclude such inmates, inviting responses from the parties. Plaintiffs responded, noting various problems with the proposed modification. I have concluded that modification would be practically impossible to manage. The evidence has shown that defendants' calculations of the time an inmate spends in segregation are not reliable. Furthermore, an attempt to limit the class to persons who were in, or expected to be in, segregation status for a specific period of time—for instance, 90 days—would require that prison personnel continually monitor such sentences for this specific purpose. Finally, as discussed below, the evidence indicates that, at least in the men's prisons, 85 percent of inmates placed in segregation remain there for 90 days or longer. Thus, the class will remain as it was originally certified by Judge Moran.

3. The male members of the class in this case are imprisoned at the Joliet Correctional Center, located in Joliet, Illinois; Stateville Correctional Center, also located in Joliet, Illinois; [3] Pontiac Correctional Center, located in Pontiac, Illinois; and Menard Correctional Center, located in Chester, Illinois.

4. Each of these four institutions is classified as a maximum security prison, meaning that the inmates confined at these institutions are generally those who have been convicted of more serious offenses [4] or have committed serious rule infractions since being confined.

5. The female members of the class are imprisoned at the Dwight Correctional Center, located in Dwight, Illinois. At the time this class was certified on August 8, 1985, Dwight contained minimum, medium, as well as maximum security units.

6. A few weeks before trial of this case commenced, the Illinois Department of Corrections established a minimum security institution for women at Kankakee, Illinois, and was gradually transferring women from Dwight to this new facility. In addition,

---

** To the extent that any finding of fact includes a conclusion of law or any conclusion of law includes a finding of fact, it shall be treated as such.

2. *See, e.g., Morrow v. Harwell*, 768 F.2d 619, 624 (5th Cir.1985). But, as the *Morrow* court noted, the right of access is individual. *Id.* Therefore, the fact that some inmates might be in segrega-

tion only a short time cannot limit the right of access of others.

3. My findings of fact and conclusions of law with regard to Stateville will be entered separately.

4. The vast majority have been convicted of murder or Class X felonies.

some women in medium security classifications have been transferred from Dwight to Logan and Dixon Correctional Centers.

### The Defendants

7. For purposes of injunctive and declaratory relief, the defendants are all sued in their official capacities. Plaintiffs' claims are therefore treated as claims against the State of Illinois. For simplicity, defendants will sometimes be referred to jointly as the "DOC."

### Gangs

8. Richard Gramley, the Warden at Pontiac Correctional Center, testified that 80 percent of the inmates in Pontiac were gang-affiliated. Salvador Godinez, the Warden at Stateville Correctional Center, estimated that 95 percent of the inmates at Stateville were gang-affiliated. Gang members are allowed to hold jobs and a substantial portion of the inmates in segregation are gang members. Warden Gramley testified that he would not be surprised if inmates assigned to the law library were gang members and that there are no screening procedures in place to determine whether inmate law clerks are in fact gang-affiliated. Despite these facts, the evidence did not show that gang affiliation plays a part in the decisions of inmate law clerks to provide materials or assistance to an inmate. There was also no evidence to the contrary. There was evidence that at least one of the named plaintiffs is gang-affiliated, and it may be assumed that most of the inmates who testified have some gang affiliation in light of the substantial percentages of inmate gang affiliations noted by the wardens in this case. The problem of gang affiliation is relevant to the need for supervision of inmate law clerks and the need for procedures to ensure that any inmate requesting assistance has access to lay personnel as well as inmates.

### Confinement of Inmates To Segregation

9. Segregation is a "jail within a jail." Inmates are confined to segregation when they violate DOC disciplinary rules, which may range from infractions such as insolence to a correctional officer to serious violent offenses such as physical attacks on guards or other inmates. The purpose of segregation is threefold: to separate the inmates, to punish the inmates, and to deter other inmates.

10. An inmate charged with violating a disciplinary rule is served with a Disciplinary Report, which states the alleged violation. The charge is then heard by the Institutional Adjustment Committee, the members of which are DOC employees. The Committee recommends a punishment, which may include demotion in grade (i.e., deprivation of certain privileges such as commissary, use of the telephone, etc.), loss of "good-time" (which has the effect of lengthening an inmate's period of incarceration), and confinement to segregation for a maximum period of one year. The Adjustment Committee's recommendations as to punishment are subject to approval by the warden of the institution in which the inmate is confined, and can be appealed through an administrative appeal process and ultimately to court.

11. Inmates may be confined to segregation in other circumstances as well. For example, inmates charged with an offense are typically placed in segregation immediately. The Adjustment Committee hearing is held and determination of innocence or guilt is made later. Inmates who have not been charged with any rule violation may also be confined to segregation while an investigation of an incident is pending.

12. Although an inmate may be sentenced to a maximum of one year in segregation for one incident, the inmate may be sentenced to time exceeding one year for separate incidents that occur either before the inmate is placed in segregation or for misconduct taking place while the inmate is in segregation.

13. In an attempt to determine the average length of time an inmate spends in segregation, the parties agreed that defendants would make a random sample of 132 men. Analysis of the sample showed that when separate but continuous segregation assignments were added, 43 of the 132 men, or 32 percent, had served a continuous stretch of at least one year in segregation; 105, or 80 percent, had served more than six consecu-

tive months in segregation; 112, or 85 percent, had served more than 90 days in segregation; and 119, or 90 percent, of the men had served a continuous sentence of at least 60 days in segregation.

14. The uncontradicted testimony at trial, supported by defendants' own exhibits, demonstrates that lengthy stays exceeding one year in segregation are not uncommon.

15. Defendants' Exhibit 153 contains a summary of the Disciplinary Reports received by the named plaintiff, Mr. Walters, between November 9, 1976 and October 23, 1989. During this 13-year period, Mr. Walters appears to have been confined to segregation the entire time, being sentenced to a total of over 80 years of consecutive segregation confinement. However, the maximum sentence on any single Disciplinary Report is one year, and the majority of Mr. Walters' sentences are from 15 to 90 days in length. Therefore, on defendants' report, this 80-year term would be listed as a series of different sentences averaging approximately six months in length.

16. Mr. Spurlock testified that he was placed in West Segregation at Joliet in December, 1989. Three months later, in March, 1990, he was placed in North Segregation at Joliet, where he remained until he was released from segregation in early September, 1990. In late September, 1990, he was returned to North Segregation at Joliet, where he remained until he was transferred to the segregation unit at Pontiac on January 9, 1991. Mr. Spurlock remained in segregation at Pontiac through the time he testified, approximately one year later. Therefore, in the three-year period between December, 1989 and January, 1992, when he testified, Mr. Spurlock was confined to segregation for all but a few weeks in September, 1990.

17. These individual examples of lengthy segregation sentences are confirmed by the testimony of defendants' witnesses. For example, Ms. Wagh, the librarian at Joliet Correctional Center, testified that there was a low turnover of inmates in the West Segregation Unit at Joliet. Assistant Warden Fleming testified that more than half of the inmates in the segregation unit at Stateville had been confined to segregation for more than 90 days.

### Representation by Counsel

18. Defendants do not provide inmates in segregation with attorneys to assist them in presenting claims to the courts.

19. While certain private groups occasionally represent inmates, including the American Civil Liberties Union, the Legal Assistance Foundation of Chicago and Chicago Legal Aid to Incarcerated Mothers ("CLAIM"), none of these groups, with the exception of CLAIM (discussed in the section on Dwight Correctional Center), sends lawyers on a regular basis to any of the five institutions at issue in this case to render legal services either to the general population or to inmates confined to segregation. Each group takes only a few select cases of systemic impact. For example, the paralegal at Dwight testified that, although the library refers inmates to outside lawyers for assistance, she was not aware of any inmate who had actually received assistance from any of these groups.

20. While a number of defendants' witnesses emphasized that inmates in segregation were permitted (at least occasionally) to use the telephone[5] or the mails to contact private attorneys in order to gain assistance in presenting their claims to the courts, defendants did not present any evidence indicating that the typical inmate in segregation has the resources required to hire a private attorney, nor is there any evidence in the record suggesting that the private bar has made any commitment to provide inmates in segregation with *pro bono* assistance.

21. Federal cases filed by members of the plaintiff class are assigned to the U.S. district courts for the Northern, Central, and Southern Districts of Illinois. The Northern

---

5. In response to my proposed findings, defendants argued that segregation inmates have "significant telephone access to counsel." The evidence did not support that statement (and in most cases, there is no counsel). I also note that in my experience, even when I have appointed counsel, it frequently requires a court order for an inmate in the custody of the DOC, even one not in segregation, to contact counsel.

District has established procedures for screening inmate claims and, in appropriate cases, appointing attorneys to represent inmates who have filed claims *pro se*. The evidence establishes that the appointment procedure is of limited use to many inmates in segregation seeking to present a claim. First, a court can appoint an attorney, by definition, only if an inmate has sufficient skills and knowledge to file an action in the federal courts in the first instance. An inmate who lacks the skills or knowledge to formulate a legal claim in the first instance will never be able to file a claim in court and thus will have no opportunity to obtain a court-appointed lawyer. Second, Dale Hayes, the coordinator for prison litigation in the United States District Court in Chicago, testified that most judges appoint an attorney to represent an inmate only after the court makes an initial determination that the prisoner's claim has substantial merit. In practice, that means that the inmate's claim must survive a motion to dismiss and, in some cases, a motion for summary judgment before counsel will be appointed. Mr. Hayes testified that attorneys are appointed for only five percent of all cases filed by inmates.

22. Terrence Madsen, an Assistant Attorney General who testified for defendants, stated that counsel is appointed for inmates who file post-conviction petitions in state court only after the petition survives the State's motion to dismiss. Mr. Madsen further testified that the most common failing of inmates was not setting forth the facts with sufficient specificity and not attaching an affidavit, as required by statute.

### Responsibility for Library Services

23. At the time this case was filed, defendants had entered into an agreement with the Secretary of State's office (who also holds the position of State Librarian) to operate the libraries in each of the five institutions at issue in this case. The Secretary of State, in turn, had contracted with regional library systems to provide the services.

24. In 1984, the Department of Corrections assumed partial responsibility for operation of law libraries at each of these prisons. Whereas previously the inmate clerks were employed and supervised by the independent library systems, beginning in 1984 the clerks were paid and supervised directly by DOC personnel.

25. In July, 1989, the defendants terminated all involvement by the independent library systems in the operation of the prison libraries. At that time, the defendants assumed direct economic and supervisory responsibility for all library staff (including both inmate clerks and civilian employees) and for all supplies, purchases, etc. The DOC's direct responsibility for the law libraries continues to the present.

### Literacy

26. According to a report from the Illinois Criminal Justice Information Authority, 72.3 percent of male Illinois DOC inmates have not graduated from high school. TRENDS AND ISSUES 91 at 88.

27. Alice Jones, a policy analyst at the Illinois Criminal Justice Information Authority, a state agency, testified regarding the literacy levels of inmates in the Illinois DOC. She stated that, in 1990, the DOC gave 13,803 inmates the Test of Adult Basic Education ("TABE"), which measures basic reading and math skills.[6] Approximately 4,000 inmates (29%) scored below the sixth grade level.[7] The average score of DOC inmates for which test scores were available at the

6. Inmates with life sentences, those who did not speak English, and those with sentences of less than two years were excluded.

7. Defendants note that the TABE score includes both a mathematical and reading component and argue that math scores may have reduced the total. Defendants did not produce any evidence to support this contention. The test material, however, is within the control of the DOC. In addition, TRENDS AND ISSUES 91, a publication of the Illinois Criminal Justice Information Authority, lists math and not English as the more popular subject among both men and women inmates. *Id.* at 99–100. Furthermore, almost 20 percent of the men admitted difficulty in reading, although fear of repercussions and embarrassment generally makes inmates reluctant to disclose reading problems. *Id.* at 98.

time of trial was eighth grade, one month.[8]

28. Inmates who score below the sixth grade level on the TABE are encouraged to participate in a 90–day basic literacy program that emphasizes reading and mathematics.[9] Of the inmates who retook the test after 45 days of instruction, 54.7 percent scored at the sixth grade level or above. 32 percent of those who retook the exam after 90 days of instruction scored at the sixth grade level or higher.[10] Not all inmates retake the test. 1,228 inmates retook the test during 1990. Of these, fewer than half scored at or above the sixth grade level. PX 126, *supra,* TRENDS AND ISSUES 91, p. 110.

29. Dr. Joanne Carlisle, a professor in the Department of Communications Sciences and Disorders at Northwestern University, testified as a literacy expert. Professor Carlisle graduated from Vassar College with a degree in English. She has a master's degree in educational psychology with a specialization in special education and learning disabilities, and a Ph.D. in learning disabilities from the University of Connecticut.

30. Dr. Carlisle testified that it was unlikely that a person who tested below the sixth grade in reading ability would undergo a significant overall change in reading ability in a 90–day reading course. The report of the Illinois Criminal Justice Information Authority, PX 126, TRENDS AND ISSUES 91, supports this opinion. That report noted that more inmates retaking the TABE after 45 days received scores of sixth grade or higher than those taking the test after 90 days and concluded that the first group might have come close to passing the first time, whereas inmates remaining in the program for the full 90 days might have had more serious deficiencies. *Id.* at 110.[11]

31. Dr. Carlisle testified that a person's reading ability is measured by the level of difficulty of text that he can read. The difficulty of a passage is a function of several variables. Among those variables is the vocabulary used, the grammatical structure of the passage and the knowledge base required to understand the passage. Dr. Carlisle testified that, in order to advance beyond a functional literacy stage, a reader must have acquired critical reading skills, such as the ability to evaluate text, interpret text, make inferences on the basis of statement in text, and draw conclusions from information in text. These critical reading skills generally begin to appear as individuals develop high school level reading skills.

32. Dr. Carlisle testified that there are various, well-accepted formulas that are accurate for establishing the readability of text. The readability, or difficulty, of text is identified by assigning it a grade level. For example, text that has a third grade difficulty is text that an average third grader could understand.

---

**8.** At the time this calculation was made, the DOC was in the process of entering the TABE score of all inmates into a computer database. Thus, many scores were not in the database when the calculation was made. Testimony from the DOC indicated that the entries were being made in a random manner. In addition to this, as stated in footnote 4, not all inmates are administered the test. Thus, the court will assume that the 8.1 score represents a rough average of the total inmate population.

**9.** The sixth grade was chosen as the minimum literacy level because the DOC determined that it had the resources to put those inmates below the sixth grade level into the basic education program without creating a serious backlog. Inmates may refuse to participate; however, the system is set up with incentives to encourage their participation.

**10.** The percentages in the text do not account for those students who chose not to participate in the program. The testimony does not indicate that every inmate who participated in the program actually retook the test.

**11.** As noted in footnote 8, the Illinois DOC program sets "literacy" at the sixth grade level. In contrast, the Federal Bureau of Prisons requires inmates to attend classes until they can read at the twelfth grade level and complete a GED or high school equivalency degree. *Id.* at 111. The difficulty in significantly improving an inmate's literacy level in a short period of time is compounded by the level of learning disabilities among prison populations. Although the DOC apparently has not measured the rate of learning disabilities among its population, the Report of the Illinois Criminal Justice Authority notes that one study found that 50 percent of juvenile delinquents have learning disabilities. *Id.* at 56. The DOC does provide special education assistance but only to inmates under the age of 21.

33. A driver's manual would often be written at about a sixth grade level, as would easier articles in magazines such as Reader's Digest. Most magazines are written at about a tenth or eleventh grade level. The NEW YORK TIMES and other nationally-ranked newspapers are written at about an eleventh grade level, while most local newspapers are written at a lower level.

34. Dr. Carlisle used the Fry, Dale–Chall and Raygor formulas to perform a readability analysis on several items of legal material that inmates would typically use in attempting to access the courts: the section of the Illinois statutes that relates to post-conviction remedies; Rule 8 of the FEDERAL RULES OF CIVIL PROCEDURE; excerpts from *Bounds v. Smith, supra; Duckworth v. Franzen,* 780 F.2d 645 (7th Cir.1985); and the PRISONER'S SELF-HELP LITIGATION MANUAL. All of the passages analyzed required at least an eleventh grade reading ability and some of the tested passages required a college graduate reading ability. For example, the headnote summary of *Duckworth v. Franzen* required graduate level reading ability. The fact section of that case required an eleventh grade level. The Illinois statute dealing with post-conviction hearings tested at college or post-college graduate level.

35. Dr. Carlisle testified that a person with an eighth grade reading ability and a high degree of motivation might be able to understand the tested materials better than she would normally predict. However, she thought that a person with a sixth grade reading level would be unable to comprehend the materials tested regardless of their level of motivation.[12] She also testified that a person at an eighth grade level of reading ability might think that he understands materials when he does not, or might comprehend only part of material intended for persons at a higher literacy level. In general, it is only at higher literacy levels—at the high school level and beyond—that people develop critical reading skills, that is, the ability to evaluate and interpret text, and to make inferences and draw conclusions on the basis of statements and information in text.

36. The testimony of several individuals confirmed that literacy levels are a problem in the institutions involved in this case. A paralegal at Dwight, for example, testified that some inmates were unable to understand mailing instructions. An inmate law clerk at Dwight, a defense witness, testified that inmates often did not understand the step-by-step "fill in the blank" instructions and form used to file a Section 1983 action in federal court. She also testified that some of the inmates did not even have the capacity to understand a form requesting appointment of counsel.

37. Dr. Carlisle's analysis is consistent with the testimony of many of the inmates who were confined to segregation. Those inmates testified that, when they were given cases by inmate clerks, they could read the words, but they were unable to determine how these cases applied to their situations or how they could be used to present a claim to the courts.

38. Finally, virtually every inmate clerk who testified at trial stated that inmates in segregation regularly requested their assistance for such easy tasks as filing a grievance or completing some of the simpler forms available in the library. Many of the clerks testified that some of the inmates in segregation could not even fill out the straightforward request forms (*e.g.*, DX 37) to request supplies or copies and that the inmate clerks had to complete these forms for them.

39. Based on my analysis of the expert testimony and the testimony of the civilian DOC employees and inmates, I conclude that the average inmate in segregation is unable to make meaningful use of the typical report-

---

**12.** Defendants assert that DX–135, Part V, 10987–88, reflects that Menard segregation inmate John Williams filed a Section 1983 suit on December 4, 1990 which clearly alleges an equal protection claim. Mr. Williams also filed a motion for appointment of counsel. Defendants note that Mr. Williams claimed to have a third grade reading level. Mr. Williams' claimed reading ability is not relevant to this case. His actual reading ability is relevant, but defendants have not provided the court with Mr. Williams' TABE score. Furthermore, defendants have not indicated whether Mr. Williams was aided in the preparation of his complaint by an inmate law clerk or other inmates who have above-average abilities and knowledge in the area.

ed court opinion and would have great difficulty making meaningful use of the PRISONER'S SELF-HELP LITIGATION MANUAL without assistance. Furthermore, plaintiffs have shown that at least one third of the inmates in segregation—those reading at the sixth grade level or below and many of those reading at the eighth grade level—would be unable to obtain meaningful access to the courts without assistance.

### Inmate Clerk Training

40. In the months immediately preceding commencement of the first trial of this case, defendants contacted Dr. Thomas Eimermann, who had founded the Paralegal Training Program at Illinois State University. Defendants contracted with Dr. Eimermann to prepare a curriculum which would be used in the maximum security institutions to train inmates to become inmate clerks. Dr. Eimermann prepared a curriculum consisting of 48 sessions covering a wide variety of topics ranging from the basics of legal research to constitutional law, prisoners' rights, torts, and other topics.

41. Defendants subsequently hired and placed paralegals at each of the institutions involved in this case and had them teach Dr. Eimermann's course to inmate law clerks.

42. Many of the inmates who graduated from Dr. Eimermann's course did not work as clerks. In some instances, inmates took the course without any intention of working as a clerk but were concerned solely with obtaining assistance for their own personal cases. Thea Chesley, the Department of Corrections official who had overall responsibility for the law libraries, also advised Dr. Eimermann that an inmate clerk's pay was too low in comparison with other jobs available to inmates and that many inmates therefore chose other jobs, even after completing the course. In other cases, inmates were transferred to another institution before they were able to begin work (or, in some cases, before finishing the course).

43. Dr. Eimermann's consulting contract with the DOC terminated in July, 1989. At about that time, the DOC transferred responsibility for the ongoing training of inmate clerks from DOC personnel to local junior colleges.

44. Although the evidence was inconclusive, it appears that the junior college teachers were sometimes provided with a copy of the Eimermann curriculum but followed only part of his outline. The course omitted, at least sometimes, segments specifically targeted at inmates' rights and the administrative and due process procedures available to inmates to challenge disciplinary proceedings and other violations of their rights.

45. Defendants did not call as witnesses any teachers or inmates who either were currently enrolled in or had completed the course. The only instructor in the college courses to testify, James Barford, testified that inmates, after completing the course, could not reasonably advise inmates in segregation of their legal options.

46. Defendants have not provided any ongoing training for inmate clerks. As discussed below, defendants have not required law clerks to take or pass any course before undertaking the duties of a law clerk.[13]

### Changes Made During Trial

47. During or immediately before trial, defendants instituted numerous changes, in particular, hiring numerous additional law clerks. The changes made by defendants under these circumstances can be given little weight, especially in light of the fact that this case had been pending for several years before trial and the fact that Bounds had explicitly required defendants to provide assistance in lieu of direct access to a law library more than one decade earlier. It seems clear that many changes were made by defendants solely to improve the trial record. Having heard the evidence, I find that there is no reason to believe that any improvement made by defendants under these circumstances will not be changed back after this case is closed. See, e.g., Gluth v. Kangas, 951 F.2d 1504, 1507 (9th Cir.1991).

---

13. Defendants argue that John Castro, a DOC official, testified that all inmate law clerks were required to have legal training. Repeated testimony that I credited throughout the trial showed that this was not in fact true.

It "cannot be said 'with assurance' that there is no 'reasonable expectation' that the alleged violations will recur." *Id.* (quoting from *Lindquist v. Idaho State Bd. of Corrections,* 776 F.2d 851, 854 (9th Cir.1985)).

### Credibility

48. My conclusions with respect to plaintiffs' access to the courts at each of these institutions are based in part on my judgments of the credibility of various witnesses. There were too many witnesses over the course of the long trial in this case for me to comment on the credibility of each witness. I have, however, considered the credibility of every witness in reaching my conclusions.

### Joliet Correctional Center
### General Background

49. There are 1350 inmates at Joliet Correctional Center ("Joliet"). Approximately 90 to 100 of these inmates are housed in two segregation units. The North segregation unit is located in a free-standing building. The building has two floors, each of which contains ten cells. Some of the inmates are double-celled; accordingly, the unit holds between 20 and 30 inmates.

50. The doors on segregation cells in the North unit are made of solid steel. Near the top of the doors is a six-inch viewing panel. Within the viewing panel is a mesh voice panel through which the inmate can communicate with someone outside the cell. In the middle of the door is a 14″ by 8″ hinged opening referred to as a chuckhole, which is kept locked. Legal materials, food and other items can be passed through the chuckhole when a lieutenant is present to unlock it. There is a ventilation panel near the bottom of the door. When a lieutenant is not present, the law clerks pass legal materials into the cell through the one-inch gap at the bottom of the door, if the materials are small enough.

51. The West segregation unit is housed in the West cellhouse. There are 40 double cells in the unit, two of which are used for showers and one of which is used for medical examinations. The cell doors in West segregation are made of steel bars and it is possible to pass items back and forth between the bars. There are approximately 60 to 70 inmates housed in the West segregation unit.

52. The segregation inmates are not allowed to participate in educational courses, to go to the library, or to check out law books from the law library.[14] They eat and shower on the unit. When a segregation inmate is transported from the segregation unit to the health care unit or the visiting room, he is shackled and wears a waist belt that allows the escorting correctional officer to control his movements. Segregation prisoners are always escorted on and off the unit by security officers one-on-one.

53. To transport a segregation inmate to the library, a security officer would have to restrain the inmate as described above and bring him to the library. The library is not designed to confine and restrict movement as is the segregation unit. There is one study cell in the library that is not used.

54. From July 13, 1991 through August 11, 1991, Joliet was on lockdown and no inmate law clerks went to the segregation unit.

### The Law Library

55. The law library subscribes to all of the essential state and federal statutes and case reporters. It contains digests, form books, legal treatises, and legal encyclopedias and dictionaries. Missing volumes, however, are replaced only once a year. Chapter 38 of the Illinois Statutes, which contains the Criminal Code, and the volume containing 42 U.S.C. § 1983 are lost or stolen every year. Copies of material from missing volumes can be obtained by an interlibrary loan from the DOC's School District Library Services. It takes approximately ten days from the time the Joliet librarian makes a request to obtain the materials.

56. The library keeps many legal forms available for use by inmates. Examples include forms for Section 1983 complaints, petitions for *habeas corpus,* petitions for executive clemency and motions for a new trial. A list of the forms is available in the library.

14. They are allowed to borrow books from the general library.

However, this list was compiled only two months before the trial of this case began, and it is not clear that the list is given to segregation inmates. If it is, it is provided only on request. It is not clear whether inmates are informed of the existence of such a list unless they ask.

57. The library makes available an "appeal package" that contains a notice of appeal, an affidavit of service, a certificate of service and mailing, a motion for appointment of counsel, and a motion to proceed *in forma pauperis*.

58. The library also keeps a list of all of the titles maintained in the legal collection. However, there was no testimony that this list is distributed to segregation inmates by request or as a matter of course.

### Civilian Librarian

59. Suluha Swati Wagh was the librarian at Joliet from May 8, 1988 until early 1992.[15] Ms. Wagh graduated from the University of Alabama in 1988 with a master's degree in library science. Her only legal training consists of a course in government documents and two legal training seminars offered by the DOC.

60. Ms. Wagh had supervisory authority over the entire library, including the law clerks. When there was no paralegal, Ms. Wagh checked the law clerks' work to ensure that it matched the segregation inmates' requests.

61. Ms. Wagh testified that she was not trained to and did not give legal advice. She testified that she relied upon the law clerks to give legal advice.

### Civilian Paralegal

62. Over the last few years, Joliet has had difficulty in keeping the civilian paralegal

position filled.[16] In 1990, the paralegal was Ms. Wolstein. Ms. Wolstein resigned in December, 1991, after she was threatened with physical harm by a segregation inmate. On February 26, 1992, she was replaced by Derrick Johnson, who quit two or three weeks later. In April, 1992, Julie Terlep, who had recently been hired as the paralegal at Dwight, was temporarily assigned to Joliet. Ms. Terlep was replaced with Patty Torres, who became the paralegal near the end of trial.[17]

### Inmate Law Clerks

63. During part of the trial in this case, Joliet had one inmate law clerk.[18] The law clerk, Raymond Green, has a GED certificate and takes college courses as an inmate from Lewis University. A second inmate law clerk, James Newsome, was terminated from this job after three weeks. An assistant warden testified that Joliet planned to hire more law clerks, but she did not know when. The law clerk or clerks serve 1,350 inmates.

64. Joliet does not require that the inmate law clerks pass the Paralegalism I and II courses taught by Lewis University before they are hired. Inmate clerk Zavorski was put to work without receiving any legal training. Mr. Zavorski worked as a law clerk for six months in 1990. He testified that, when he started working as a law clerk, he was given no guidance on how to assist the inmates and no criteria as to the kinds of cases on which he should help. An experienced clerk was not assigned to give him assistance or instruction.

65. Some law clerks attended the paralegalism training course prior to or during their employment as law clerks. One such clerk was Wilbert Blanch. Although Mr.

---

**15.** Ms. Wagh left her position as librarian soon after she testified in February, 1992. It is unclear as to when a new librarian was hired, although it was apparently a number of months later.

**16.** Defendants argue in their post-trial proposed findings that a librarian aide performed some of the duties of a paralegal (or inmate clerk) such as filling and delivering requests for legal materials. Actually, it appears that the aide at one point may have been the only civilian or inmate worker to service the entire library due to resignations

and dismissals of civilian personnel and inmate clerks. There was no testimony that the aide had any training for her work. (Tr. 5739–42.)

**17.** With the exception of Ms. Terlep, none of the Joliet paralegals testified at trial. Ms. Terlep was assigned to Joliet after she had testified about her work at Dwight. She did not testify about her work at Joliet.

**18.** At one time in 1990, Joliet had three law clerks.

Blanch had passed both Paralegalism I and II, Ms. Wagh terminated him soon after he was hired because he was unable even to read a legal citation.

66. Lewis University's "Site Coordinator" at Joliet, Nathaniel Richards, is responsible for the college academic programs at Joliet. He was not familiar with Dr. Eimermann's course outline, which the courses were supposed to follow. He testified that the course actually taught did not include prisoners' rights in its syllabus.

67. When there was more than one law clerk and library staff, the law clerk would visit the segregation wings accompanied by the paralegal or librarian at 1:00 p.m. on Mondays, Wednesdays and Fridays. He would return to the library, which closes between 2:30 and 2:45 p.m., at approximately 2:30 p.m. On Tuesdays and Thursdays, the law clerk was scheduled to fill segregation requests. However, inmates from the East cellhouse have access to the library during that time and require assistance.

68. Ms. Wagh testified that she directed inmate law clerks to give priority to the segregation inmates' needs. She also testified that the law clerks had four hours per day, four days per week, to work on the segregation requests.[19] It is clear that, even when there was more than one law clerk, the law clerks did not have four hours per day to devote to the segregation inmates' needs. Even if Ms. Wagh did instruct the law clerks to give priority to segregation inmates[20], the reality is that while the clerks are in the library there are always other inmates using the facilities and seeking assistance from the few available law clerks.

69. When the law clerk is on the segregation unit, he distributes and collects legal request forms and delivers previously requested materials. Mr. Zavorski testified that, as a law clerk, he would stop and try to answer inmates' questions verbally while he was collecting their request forms. However, because of time constraints, Mr. Zavorski was usually only able to get halfway down the line of cells before he was forced to leave the unit. Mr. Zavorski stated that the officers required the law clerk to be off the unit during shift change, which occurred between 2:30 p.m. and 3:00 p.m. He also testified that he had complained that he was not given enough time on the unit to see all those who needed help and that he requested permission to go to the segregation unit earlier, but the schedule was not changed.

70. When visiting the segregation unit, the law clerk does not have time for in-depth interviews with inmates that would enable him to prepare substantive legal documents such as complaints or petitions. In addition, a prison officer is often nearby, thus making the transmission of any confidential information difficult.

71. Edna Lee, Assistant Warden of Programs at Joliet, testified that, if a segregation inmate informed a librarian or paralegal that he had violated a prison rule, the librarian or paralegal would have to report what the inmate said in a disciplinary ticket.

72. The ability of segregation inmates to communicate with the law clerk is further hampered by the generally loud noise conditions on the segregation unit. In the West segregation unit, this is particularly a problem because the doors are barred and the noise from the inmates and their radios and televisions make it difficult to hear.

73. A segregation inmate can receive photocopies of any material in the library for five cents per page. If an inmate has no money in his trust account, he is provided copies of the requested material and his account is debited when he has the money. If an inmate returns copies of cases, he is not charged. However, in order to see a case, an inmate must first sign a voucher authorizing payment from his inmate account.

74. Mr. Zavorski testified that, as a law clerk, he did not draft any Section 1983 complaints, *habeas corpus* petitions, post-

---

19. Ms. Wagh also stated that she had not seen illiterate inmates. That testimony is inconsistent with defendants' admissions. Later, she testified that the law clerk would draft papers or write letters for illiterate inmates. That testimony is inconsistent with other evidence and I specifically discredit it.

20. As noted in the previous footnote, Ms. Wagh's credibility was impeached on numerous issues.

conviction complaints, or any pleadings for any inmate in segregation because he did not know how to draft these documents. Mr. Green testified that, during his three stints as a law clerk, he received many requests for drafting assistance but had also never drafted pleadings because he did not have enough time to do so. This testimony is supported by the evidence. The request forms for legal assistance used at Joliet do not include a space where substantive legal assistance might be requested, and my own review of the library's responses to requests over a three-year period did not indicate that any drafting assistance was provided. In addition, the sheer volume of requests for materials and the paucity of law clerks and other staff would not have allowed even an accomplished attorney to write briefs or draft materials in the available time.

75. Defendants claim that they rely on volunteers and "jailhouse lawyers," *i.e.*, inmates who are not law clerks, to supplement their system of law clerk assistance. I found no credible evidence that any other inmate provided assistance to prisoners in segregation or otherwise. In addition, a regular inmate is not allowed to go to segregation to discuss a segregation inmate's legal problems.

## Pontiac Correctional Center

### General Background

76. Pontiac Correctional Center ("Pontiac") is a maximum security institution operated by the Illinois DOC, located in Pontiac, Illinois. There were approximately 1,930 inmates at Pontiac at the time of the trial. There are approximately 265 inmates in segregation at Pontiac at any given time.

### Pontiac Law Library

77. Segregation inmates at Pontiac are not permitted to go to the law library or even to borrow books from the law library. The Pontiac law library contains a single study cage, but inmates from segregation are not allowed to use it.

21. Pontiac has two correctional facilities: one is a maximum security institution and one is a

78. The Pontiac library contains neither the official nor the annotated version of the UNITED STATES CODE covering 42 U.S.C. § 1983 (although the statute is included in the PRISONERS' SELF-HELP LITIGATION MANUAL).

### Civilian Librarian and Paralegals

79. Pontiac has one librarian, Malini Patel. The record contains no information about her, other than the fact that she supervises the paralegals. She apparently had no involvement with segregation inmates. She did not testify.

80. At the time the trial of this case began, a single civilian paralegal, John Holmes, served the Pontiac law library. In addition to his responsibilities at the maximum security prison, Mr. Holmes spent part of his time operating the law library at the medium security institution in Pontiac, Illinois,[21] which has a separate library.

81. Mr. Holmes did not have a college degree. He completed a paralegal course sponsored by Carthage College of Kenosha, Wisconsin in the summer of 1987. This course met for approximately 72 hours and covered a wide variety of topics. Mr. Holmes did not take any tests prior to being hired. The DOC relied entirely upon the "certificate of completion" awarded by Carthage College. Mr. Holmes was hired as a paralegal in 1987. Prior to that time, he had worked in a variety of jobs, none of which were in any way related to the law. Mr. Holmes received no training in areas of particular interest to prison inmates such as *habeas corpus* petitions, post-conviction remedies, Section 1983 civil rights suits, or related areas.

82. Mr. Holmes understood that he was prohibited from giving legal advice because he was not a lawyer. He understood that his responsibilities were limited to advising inmates as to basic procedural issues such as the number of copies that had to be filed with the court, the address of the clerk of the court, and the correct form or format in which a pleading should be filed.

medium security institution.

83. At the time Mr. Holmes began working at Pontiac in 1987, he was employed by the Cornbelt Library System, which had a contract to operate the law library on behalf of the DOC. On June 30, 1989, the DOC assumed the direct operation of the law library and became Mr. Holmes' employer.

84. Mr. Holmes was generally responsible for supervising the inmate law clerks. In addition, he had responsibility for directly servicing the condemned unit, processing all books received by the library, ordering and inserting pocket parts, updating periodicals, and all of the other recordkeeping and filing for the law library.

85. Mr. Holmes did not have the time to supervise the actual legal work done by the inmate law clerks. He did not know which cases any individual law clerk was working on.

86. Mr. Holmes had no opportunity to pursue his own continuing education, nor did he have any opportunity to deal with outside groups which provide assistance to inmates.

87. After the trial began in this case, defendants hired a second paralegal, Joni Stahlman, to serve the inmates in the maximum security prison at Pontiac. The written job description for Ms. Stahlman's position states that a paralegal's job does not include drafting legal documents, representing inmates, or conducting research on behalf of inmates.

88. Although the written job description requires Ms. Stahlman to provide workshops for inmates, she had never conducted any such workshops at the time of the trial. Ms. Stahlman said that she had requested that workshops be provided in which attorneys would come in and teach inmate law clerks about research, but her superiors had not approved any such workshops.

89. Ms. Stahlman, like Mr. Holmes, believed that, as a paralegal, she was not permitted to give legal advice. She also testified that the inmate clerks often know more about prisoner-related issues than she, and that, therefore, she could not meaningfully review the substance of their work. She also discourages the inmate clerks from giving legal advice because she is concerned that they are not lawyers and therefore might give incorrect advice on constitutional and other issues.

90. Ms. Stahlman did not serve the segregation inmates and had never been on the segregation unit.

91. The civilian paralegals can give only very limited assistance to either inmates or inmate clerks. For example, Ms. Stahlman testified that one of the Pontiac library forms is a "criminal complaint." Ms. Stahlman did not know whether an inmate could initiate a criminal action in this manner. Similarly, Ms. Stahlman did not know what appeal rights an inmate might have from a finding of guilty on charges contained in a prison disciplinary ticket.[22]

92. Ms. Stahlman had not reviewed all of the legal forms in the Pontiac library that are given to inmates. She reviewed some of them with a DOC attorney who told her that the forms did not need to be changed.

93. The law library keeps a list of attorneys, which is given to inmates. The law library does not keep a record of referrals to attorneys, and Ms. Stahlman said that she does not know whether any attorney on that list had ever taken a case from an inmate at Pontiac.

### Inmate Law Clerks

94. In the time leading up to the trial of this case, there had been four law clerks at Pontiac, although sometimes there were only three. According to Mr. Holmes, the parale-

22. Ms. Stahlman claimed that she did some legal research. However, when questioned by me as to an example, she said that she deferred to the law clerks who were more knowledgeable than she. Defendants' proposed findings were particularly misleading with regard to Ms. Stahlman's testimony. Although Ms. Stahlman, who had obviously been coached in her testimony, made statements which defendants then referred to as "facts" in their proposed findings, in every case she herself gave contradictory testimony. Pontiac's other paralegal, Mr. Holmes, testified credibly, and his testimony is the best evidence that Ms. Stahlman's testimony was not credible. Her testimony was also contradicted by the various law clerks. As noted earlier, the librarian was not called as a witness.

gal, three clerks were not adequate to serve the legal demands placed on the law library by the 1,930 inmates at Pontiac. As a result, Mr. Holmes had been requesting permission for many months to hire additional clerks. Six weeks before the trial of this case began, defendants assigned six additional inmate clerks to the Pontiac law library.

95. There is generally a high turnover of clerks at Pontiac. As of December, 1991, only one of the nine clerks assigned to the law library, Clayton Rockman, had more than two years of experience.

96. John Reese, a Pontiac inmate, was assigned as the segregation librarian from 1985 through August, 1988. As a segregation librarian, he helped distribute general library reading materials. He did not have responsibility for providing legal assistance or legal materials to inmates in segregation.

97. · During this three-year period, there were from 250 to 265 men in segregation. More than half of those seen by Mr. Reese at one time or another asked him for legal assistance, even though providing legal assistance was not one of his responsibilities.

98. Mr. Reese later began working as an "unofficial jailhouse lawyer." (Mr. Reese has a bachelor's degree in criminal justice.) In October, 1988, Mr. Reese received a disciplinary ticket and was charged with having contraband in his cell. This "contraband" consisted of law books (Illinois and Federal Codes of Civil Procedure) and typing supplies.

99. In November, 1989, Mr. Reese received another disciplinary ticket for providing legal assistance to other inmates. He admitted that he gave such help and was found guilty by the Adjustment Committee.

100. In April, 1990, Mr. Reese applied for the position of law clerk at the Pontiac library. He was interviewed by Mr. Maus, the supervisor in charge of all library operations at Pontiac. At the interview, Mr. Maus informed Mr. Reese that he would be assigned to the library only if he refrained

from filing any lawsuits against the Pontiac Correctional Center for 90 days.

101. In August, 1990, Captain Skidmore, the DOC official responsible for the supervision of the segregation unit, advised Mr. Reese that he could no longer speak to inmates who requested his assistance in segregation; he was only to deliver documents to those inmates who had submitted written requests to the library for assistance.

### Inmate Clerk Training

102. Mr. Holmes began teaching a paralegal course based on the Eimermann model to inmate clerks in January, 1988. Responsibility for teaching the inmate paralegal course was later transferred to McMurray College. McMurray College has held two different sessions of courses known as "Paralegal I" and "Paralegal II."

103. Mark Barford, a licensed attorney, taught the paralegal course at Pontiac from January, 1992 to May, 1992. Mr. Barford testified that he did not follow the Eimermann course outline because he found the material to be too difficult for his students. The course was scheduled to meet from 6:00 p.m. to 9:00 p.m. twice per week. In fact, many of the classes were cancelled due to lockdowns and the students regularly came to the class late, which substantially reduced the time during which the course could be taught. Mr. Barford testified that the two courses he taught were not sufficient to teach a law clerk how to file a Section 1983 civil rights case, a *mandamus* case, or a petition for post-conviction relief.[23]

104. Mr. Barford's ability to teach the course was hampered by DOC representatives. During the session, Mr. Barford attempted to teach the inmates about the various aspects of Section 1983 litigation by using as an example a grievance regarding tuberculosis which had been filed by some of the inmates in the class. Within a week of giving students an assignment based on this example, Mr. Barford was advised by Mr. Maus that the assignment created a "security

---

**23.** Defendants listed in their final pretrial order persons who had taught the paralegal training classes at each of the five institutions. However, defendants did not call any of these teachers as witnesses. I therefore assume that their testimony would be consistent with the testimony of Mr. Barford, except where noted in this opinion.

problem" and was ordered to terminate the assignment.

105. There is no ongoing in-service training provided for inmate clerks. Whatever training they receive after they are hired is through on-the-job experience.

### Service to Inmates in Segregation

106. Inmates in segregation cannot go to the law library. Therefore, their only means of access to legal assistance is through the periodic visits of the inmate clerks to the segregation unit.

107. Prior to the hiring of six additional inmate clerks six weeks before the trial began, the clerks were supposed to go to the segregation unit three times per week. However, the library was unable to maintain any set schedule for servicing the segregation unit. Mr. Holmes, the paralegal, directed the clerks to go to segregation as often as possible. One of the inmate law clerks, Mr. Rockman, testified that the duties of the three law clerks included assisting general population inmates with their legal needs, going to the condemned unit, the protective custody unit, and both segregation units.

108. Pontiac failed to maintain any procedure for clerks or civilian personnel to sign in and out of the segregation unit. Therefore, it is impossible to determine with any precision the regularity with which library personnel actually went to segregation prior to September, 1991, when Pontiac began to keep more accurate records. DOC records for that month indicate that only one inmate law clerk went to segregation, and he only a total of five times, during the month.

109. After the assignment of six new clerks shortly before trial, Mr. Holmes requested that five of the inmate clerks be permitted to service segregation. The assistant warden responsible for programs at Pontiac refused permission.

110. Mr. Rockman is one of the three inmate clerks responsible for serving the segregation unit. When Mr. Rockman visits the segregation unit, he is subject to either a pat-down or strip-search.[24] Warden Gramley testified that inmates going into segregation are supposed to be subjected to a strip-search either when entering or leaving the unit in order to discourage the introduction of contraband.[25]

111. In addition to a search of the inmate clerk, the officer on duty reviews the materials the inmate clerk is bringing into the segregation unit. At least one of the officers, Officer Eddleman, not only reviews the material for contraband but reads each document and makes his own determination as to whether the document is in fact a "legal" document. Any document which Mr. Eddleman determines, in his own judgment, is not a legal document, is taken from Mr. Rockman and given to the captain of the segregation unit. Although defendants agreed that the officer searching the inmate is not supposed to read each page, defendants did not rebut Mr. Rockman's testimony regarding Officer Eddleman's review of materials.

112. After entering the unit, the inmate clerk walks down one of the galleries in the unit. In order to reduce the number of inmates who request assistance, Mr. Rockman does not announce or otherwise advise inmates that a clerk is present. He delivers material to individual inmates who previously have filed requests, and stops to talk with those inmates requesting assistance that he has time to see.

113. Of the 50 inmates on each gallery, Mr. Rockman sees approximately 10 to 15 inmates on each visit. On a typical visit, Mr. Rockman receives five to ten requests from segregation inmates to which he is unable to respond.

114. The Pontiac paralegals and law clerks do not keep records of requests for substantive assistance. There are no procedures or criteria governing which inmates will be given substantive assistance. Mr. Holmes testified that the decision of whether or not an inmate clerk will help an individual inmate in segregation is left to the clerk. It was also clear from Ms. Stahlman's testimo-

---

24. Another inmate clerk testified that he was strip-searched every time he entered segregation.

25. The practice at the other Illinois institutions involved in this lawsuit is to conduct random strip-searches.

ny that she had no idea what, if anything, any law clerk was working on.

115. A number of inmates have advised the law library that they are functionally illiterate, and, therefore, unable to perform any research or writing on their own. Mr. Holmes has sometimes verified their functional illiteracy. Mr. Holmes has no reason to disbelieve the inmates' statements in other cases.[26]

116. At the time he testified, Mr. Rockman was working on substantive matters for five inmates. Mr. Rockman does not respond to all of the requests he receives from inmates in segregation because there are many more requests than he has time to process. In order to provide additional assistance to inmates in segregation, Mr. Rockman uses four "writ writers"—inmates in segregation who have some legal experience. However, even with this additional help, Mr. Rockman testified that he cannot begin to meet the demand by inmates in segregation for legal assistance.

### Lockdowns

117. During a lockdown, inmate clerks are not permitted to go to the library or to the segregation units. The inmate clerks are permitted to do some legal work in their cells; however, Mr. Holmes testified that their ability to perform meaningful work is "greatly hampered" during a lockdown. There have been a minimum of 15 lockdowns in the last four years at Pontiac. The shortest of these lockdowns has been two days, and the longest has lasted in excess of one month. During a lockdown, Mr. Holmes and the other library personnel attempt to provide service to inmates in segregation. However, the civilian personnel must provide legal services to the entire population of Pontiac. As a result, their assistance is limited to distributing forms requesting extensions of time. Mr. Holmes testified that he did not have time to help the inmates complete these forms.

### Miscellaneous

118. No outside agency is available to the inmates at Pontiac to provide substantive help. Although Ms. Stahlman indicated that she could call Prairie State Legal Services for assistance, she could cite only one example involving a divorce matter where she had actually called for information. Ms. Stahlman testified that Prairie State Legal Services did not take any cases for inmates.

### *Menard Correctional Center*
### General

119. Menard Correctional Center ("Menard") is the largest maximum security prison in Illinois. There are 2,400 inmates at Menard. Seventy-eight percent of the inmates have been convicted of murder, Class X, or Class 1 offenses.

120. Although Menard has more inmates than any other Illinois maximum security facility, it has fewer staff members. There are five or six correctional officers for every 300 inmates. Many of the inmates are violent.

### Segregation

121. There were 270 inmates in the segregation unit at Menard in April, 1992. On occasion, there have been 300 or more inmates in segregation. The segregation unit includes 100 double cells; the remainder are single cells. Most have bars in front, but 55 cells have solid doors, some with plexiglass view panels. A segregation cell is 4½ feet by 10½ feet, with a bed, sink, toilet, and light.

122. Segregation inmates are prohibited from participating in prison programs. Segregation inmates are brought to the showers in shifts during the course of the day, and to the yard three times per week for two hours.

123. The segregation unit has a higher incidence of serious and violent behavior problems than the other units. Therefore, it is more difficult to maintain safety and order with respect to inmates confined in segregation. Nonetheless, defendants escort inmates out of the segregation unit to the

---

**26.** As defendants point out, in one case, Mr. Holmes did disbelieve an inmate and his investigation appeared to prove his point. My interpretation of Mr. Holmes' testimony that he has believed inmates' claims of illiteracy in other instances is that based on what he has heard or learned about the inmate, he has no reason to disbelieve the statement.

health care unit daily as well as to the grievance committee and the administrative review board.

124. Segregation inmates are also escorted out of the segregation unit for personal and legal visits. There are small rooms available for attorneys to visit with inmates. The correctional officer escorts the inmate, waits, and returns him to his cell.

125. A segregation inmate is permitted one telephone call per month. In addition, he is permitted to call an attorney if he can verify that he has an attorney; otherwise, permission to call an attorney is discretionary with the correctional officer.

### Access to Legal Services

126. Menard has a law library with a collection that plaintiffs agree is adequate.[27] When fully-staffed, the library employs a library associate, who performs the functions of a librarian; a paralegal; and a library assistant. At the time of the trial, the library associate at Menard was Leanne Pate. She has a bachelor's degree in history with a minor in library science. Her responsibility is to oversee the library, which houses both a general collection and a law library. In the absence of a paralegal, she provides direct supervision of the law library. There was no testimony to indicate that she had any legal training. A library assistant works under both Ms. Pate and the paralegal, performing such functions as making up lists of segregation inmates who can come to the library, notarizing documents, and delivering supplies to cells.

127. The law library contains five study cells for segregation inmates. A segregation inmate must make a request in order to be allowed to visit the library. Library visiting hours for segregation inmates are 8:00 a.m. to 10:00 a.m. and 11:00 a.m. to 1:00 p.m., four days per week.[28] (Shortly before the trial began in this case, an additional period was added one day per week.) Testimony indicated that, in practice, inmates did not have two full hours in the library and could have as little as one hour. Because more persons want to visit the library than can be accommodated, each inmate requesting time is allowed to go only once per day. Those with verified court deadlines have priority, but because these would be the only inmates who would be able to visit the library if they used all of the allowable time slots, inmates with verified deadlines are only given a certain portion of the five spots available in any time slot. An inmate may sometimes have to wait weeks to get to the library if he does not have a court deadline. (In at least one case documented by the DOC, an inmate could not visit the library until two months after making his request.) While a person with a deadline may be able to go to the library several times in one week, others will go only once.

128. Once a segregation inmate arrives at the Menard law library, he is placed in one of the five study cells in a room separate from the rest of the library. He must rely upon an inmate law clerk to receive materials. Inmates sometimes have difficulty in obtaining materials because the law clerk is too busy to fill requests.[29] The evidence was disputed as to whether segregation inmates have access to a library list of available forms and books.[30]

---

**27.** They do note that books are often missing or have pages taken out but do not dispute that the library tries to replace missing items, either by new purchases or loans from other libraries. They do not allege that missing materials constitute a constitutional violation. The library's collection includes state and federal statutes and reporters, and secondary authorities and practice guides, such as the PRISONERS LITIGATION SELF–HELP MANUAL and POST CONVICTION SELF–HELP REMEDIES MANUAL.

**28.** Sometimes, however, the library "line" is cancelled due to institutional problems. In one incident during trial, segregation inmates were not permitted to go to the library cells for several days.

**29.** An inmate who wants to do research may encounter other problems. A defense witness testified that he had observed inmates in the study cells talking, verbally abusing other inmates or staff, and urinating on the floor.

**30.** Ms. Pate, the library associate, testified that such a list was available to inmates. Two inmates testified that inmates did not have access to such a list. The list itself is ten pages long and is not descriptive (apart from whatever description exists in the title of a book). It does not appear to have been prepared for use by inmates

129. Segregation inmates are not allowed to take books out of the library. The library also does not allow inmates to borrow copies of court opinions.

### Inmate Clerks

130. Apart from scheduled time in study cells in the library, segregation inmates at Menard have contact with the library through inmate clerks who visit segregation.[31] However, until the time of the trial, only one law clerk had been assigned to segregation inmates. During the trial, Menard assigned a second law clerk to the segregation unit. These law clerks were scheduled to go to the segregation unit four times a week for two hours.[32] In the segregation unit, the clerk takes requests for forms, materials and paper, which are filled by the library. The clerks do not attempt to interview inmates because of noise and other distractions on the segregation unit.[33]

131. At the time of the trial, there were five inmate law clerks at Menard to serve the entire prison population, apart from those prisoners in protective custody. Until the trial, there were only three prisoner law clerks to serve the entire prison population. Thea Chesley, the DOC Library Services Coordinator, testified that Menard should have between 10 and 20 clerks to properly serve the needs of all inmates. The evidence indicated that 10 clerks would be insufficient.

132. The inmate law clerks are paid between $20 and $45 per month. At the time of trial, most received $20 per month.

133. Ms. Pate, the library associate, testified that, beginning in the fall of 1991, she required inmates to pass a "law skills" test written by a paralegal in order to become law clerks.[34] Law clerks are supposed to take the paralegalism course discussed earlier in this opinion. As was the case elsewhere, the actual course taught did not cover all of the topics needed. Topics not covered in one session included prisoners' rights and *habeas corpus* petitions. At least two of the three law clerks at the time of the trial who went to segregation or were assigned the segregation cells in the library had not yet taken a paralegal course. The other clerk assigned to segregation finished the course during the trial.

as a reference source. It was not posted in the study cells.

31. Defendants also rely on testimony of Mr. Chappell, the paralegal, that he went to segregation once or twice a week. However, defendants' records showed that this testimony was not accurate. According to these records, in some months Mr. Chappell was never on the segregation unit at all.

32. Until shortly before the trial, defendants did not keep a log showing visits by the law clerks to segregation.

33. Some of the other difficulties in interviewing segregation inmates were illustrated by one inmate law clerk, Mr. White, who testified that he could not see, and sometimes did not know, the inmate behind a solid cell door in segregation. In order to hear, he had to put his ear to the crack of the door; to be heard, he had to put his mouth to the crack of the door. He did not know what might be thrown at him by unfriendly inmates on these occasions. (Tr. 526–27.)

34. Ms. Pate testified that clerks took and passed this test, even without a legal training course. There was no other testimony regarding the test. I have reviewed it, however, and I do not believe that anyone could pass it without substantial legal training. Furthermore, the test states that it is to be taken in two and a half hours. I doubt that most lawyers could complete the test in this time. The questions include essays on topics such as, "What are the differences in terms of function and content between a petition for postconviction review and a petition for writ of *habeas corpus*?" and "Briefly discuss the circumstances under which a prison inmate would be likely to use a Section 1983 action, and those in which he would be likely to use an application for a writ of *habeas corpus*. What would be some of the remedies available under both actions?"

Defendants did not introduce any actual test papers. My skepticism in relying on Ms. Pate's testimony about this test is increased by the fact that the only paralegal skills instructor to testify at trial stated that inmates could not understand his course. My skepticism is further increased by examination of a test paper completed by an inmate law clerk at Dwight Correctional Center. That test, while similar in some respects to the test that Ms. Pate testified was taken by inmates at Menard, appeared to be less difficult. The inmate law clerk who took the test had two years of college at the University of Minnesota and had taken a paralegal course. She scored 78 points (out of a possible 95). Based on all of this evidence, I have not found defendants' reliance on inmates' allegedly passing the legal skills test to be worthy of any weight in assessing their legal knowledge.

134. The orientation manual distributed to inmates at Menard says that inmate law clerks should get inmates started on their legal research but that the clerks will not draft documents or conduct actual research. At the time of the trial, it appeared that this policy was not enforced. Nevertheless, there was little evidence that law clerks prepared petitions, complaints or other legal papers for inmates other than themselves. Although Ms. Pate and Mr. Chappell both testified that law clerks told them that they were doing work for inmates, neither identified any work that they had seen, and both indicated they never reviewed any such work. One inmate law clerk testified that he had not filed a *habeas* petition on his own behalf because he did not know how to file a petition. There was evidence that, at times, law clerks did prepare legal papers for inmates other than themselves and charged them for their services.[35] There was also evidence that inmate law clerks do not hold in confidence information given to them by other inmates.

135. Even if the inmate law clerks are willing to work on petitions for prisoners other than themselves, the small number of clerks for the prison population and the other work required of them would prevent them from doing so. The duties of the inmate law clerks [36] include updating legal materials, requesting photocopies and examining photocopies when made, going to segregation to take requests and bring materials, helping inmates in the library with citations and requests for materials, and attending the "paralegalism" class when enrolled in the course. All of these duties must be carried out by five clerks (not including the two clerks whose duties were to serve protective custody inmates) for a prison population of 2,400 inmates, including between 270 and 300 inmates in segregation at any one time.

136. Defendants relied on the experience of one law clerk, Arthur Rico Stringer.[37] Mr. Stringer has been in the system for many years and had been a law clerk at several institutions at various times since 1975. However, despite his attempts to become a law clerk at Menard, he was hired only a few weeks before the trial. He was not one of the clerks who visited segregation.[38] In addition, the fact that Mr. Stringer's duties began only with the trial of this case fails to account for the many years before trial.

### Paralegal

137. The inmate law clerks work under the direction of the library's paralegal, when one is employed. During 1990 and early 1991, for a period of eight or nine months, Menard did not have a paralegal.[39] In 1991, Gene Chappell was hired as Menard's paralegal. He quit shortly after testifying in April, 1992. There was testimony that, at least by July, 1992, he had not yet been replaced.

138. From the testimony of both Mr. Chappell and inmates, it is apparent that, in practice, the inmate clerks receive essentially no supervision with respect to their work. For instance, Mr. Chappell testified that he cannot, and does not, give legal advice, or

35. Ms. Pate testified that she fired one law clerk for charging for services.

36. There was no specific testimony about their hours at Menard, but DOC regulations require them to work only four hours a day.

37. Defendants also refer to the testimony of Howard Peters, Director of the Illinois Department of Corrections. After DOC records showing that official DOC policy prohibited inmate law clerks from drafting pleadings for other inmates were put in evidence, Mr. Peters testified that he wrote to the wardens of the institutions involved in this case, telling them to correct such policy statements. In his testimony, Mr. Peters stated that law clerks actually do write such petitions. He recited no basis for any knowledge of actual practice, however, and his testimony as a whole indicated he was unfamiliar with actual practice. Indeed, he was unable to identify any prior written policy in the control of the DOC that even allowed, let alone required, inmate clerks to assist other inmates in drafting pleadings.

38. Indeed, although he testified that he took requests from the segregation inmates who came to the study cages, both the librarian, Ms. Pate (who testified some months later), and the paralegal, Mr. Chappell, testified that Mr. Stringer was primarily a reference clerk who hands out forms and books to all inmates. (Tr. 4603, 4632, 4675.)

39. Ms. Pate testified that one paralegal left in July, 1990. A replacement was not hired until April, 1991.

advice as to legal strategy.[40] He was not allowed to draft pleadings and did not conduct research. He testified that he was prohibited from performing either of these activities both by his job description and by his understanding of the legal and ethical limitations on what a paralegal may do.

139. Apparently Mr. Chappell would have been unable to provide much supervision even if he chose to get involved. He did not know whether the forms provided by the library met the filing requirements for the various federal courts in Illinois, did not know whether the post-conviction relief form introduced in court was the same form distributed by his library, did not know whether there was a new sentencing code, and did not appear to understand the post-conviction petition. Mr. Chappell stated that he never told inmates whether a requested form was the correct form to use for a particular action. He did not even know who drafted the forms distributed by his library, although he thought that they had been prepared by inmate law clerks.

140. Mr. Chappell also testified that, if an inmate, in asking him for advice, told him that the inmate had broken a rule, he would be required to document the infraction and report it.

### Photocopy Policy

141. Inmates may purchase photocopies of documents at five cents per page. If an inmate does not have the money, it is charged to his account. At the time of trial, the library had a posted policy that allowed inmates to have photocopied only five cases per week. This policy had been in effect for about 18 months at the time of trial.[41] The library associate, Ms. Pate, testified that the library will relax the policy if an inmate

shows that he needs more cases copied and the library is not too busy.

### *Dwight Correctional Center*
### General

142. Dwight Correctional Center ("Dwight") is the DOC's reception and classification center for female offenders. It houses minimum, medium and maximum security inmates.[42] It also has a condemned unit and the mental health facility for female offenders in Illinois. Approximately 662 prisoners are incarcerated at Dwight, roughly 20 percent of which are maximum security inmates. There are approximately 200 correctional officers serving in three shifts at the institution.

143. Inmates arriving at Dwight receive an orientation presentation which informs them of the services available at the prison. They do not receive a presentation about the law library, but a prison manual given to each inmate contains a paragraph describing the law library.

### Segregation

144. The segregation unit at Dwight is composed of 21 cells. Fourteen cells hold two inmates and seven hold one. At the time of the trial, 29 women were in segregation. As many as 48 women have been in segregation at one time. The average stay in segregation is between 15 and 20 days. However, the assistant warden testified that some inmates have been in segregation for many months. A few inmates have been there for up to one year and at least one woman was in segregation for a longer period. In addition, some inmates are in and out of segregation throughout their sentence.

145. Each segregation cell has a solid door with a food slot that is approximately 12

---

**40.** Defendants argue, from general testimony elicited from Mr. Chappell, that he did indeed advise inmates on such matters as the proper forms to use. It is clear from Mr. Chappell's testimony as a whole that he did not do so, and in fact was not even familiar with the forms. *See, e.g.,* Tr. 4700. I specifically discredit any other testimony as not believable.

**41.** Defendants introduced testimony that this posted policy was not followed after I indicated that the policy unconstitutionally limited in-

mates' access to courts. I did not find this later testimony credible and I find no reason not to believe Ms. Pate's testimony on this point. Defendants' testimony also showed that the policy is posted at various places in the library.

**42.** Defendants assert that Dwight is not considered a maximum security facility because it houses inmates of all security classifications. However, defendants never objected to Dwight's inclusion as part of the class.

inches wide and 6 inches high. The door has a plexiglass window, approximately $8 \times 8$ inches and a perforated speaking panel that allows someone standing in the hallway to communicate with an inmate in the cell.

146. Segregation inmates are allowed out of their cells only for showers, recreation, hearings, medical examinations and for personal visits or visits with attorneys.

147. When an inmate is taken out of her segregation cell, she is handcuffed through the food slot before the door is opened and is then escorted by two officers. Segregation inmates at Dwight are never transported in groups of more than one except when they are taken in a line to the recreation yard which is adjacent to the segregation unit.

148. Segregation inmates are not allowed to go to the law library because of security concerns. Defendants say that two guards would be required to escort inmates to the library. Moreover, both doors of the library would need to be secured and the library would need to be staffed with security officers. The library would also need to be cleared of other inmates to accommodate the segregation inmates. Segregation inmates would have to be brought down a hallway past several classrooms, raising concerns that they would disrupt the educational programs occurring in the building.

### Law Library

149. The general library is run on a day-to-day basis by a librarian. The law library is supervised by a paralegal. The paralegal and inmate law clerks are hired by the DOC.

150. The law collection includes all essential state and federal statutes, case reporters, numerous digests, form books, legal treatises, legal encyclopedias, dictionaries and other research tools and secondary authorities. The law library has a budget which is separate from the educational budget and is open-ended for legal updates which West Publishing sends automatically.

151. The law library maintains a list of all of its available resources. Copies of this list are kept in the segregation unit and inmates can obtain a copy by asking the officers. However, there was testimony which indicated that inmates may not know the list is available. The law library also contains several copies of the PRISONERS' SELF-HELP LITIGATION MANUAL. Inmates are allowed to check out this book and segregation inmates may keep this book in their cells.

152. Segregation inmates are not allowed to have typewriters in their cells.[43]

153. The paralegal is responsible for ordering legal materials for the library. Dwight does not have a problem with respect to missing legal materials.

154. The library has civil and criminal legal forms available for inmates to use, including forms for civil rights cases, post-conviction petitions, family law cases and other state and federal cases. The evidence indicated that Nancy Nicklies, the paralegal at Dwight from April, 1987 until February, 1992, attempted to update and correct forms. There was testimony that some forms in the library were of no use, or even harmful. The testimony indicated that forms which could harm an inmate's request concerned custody matters.

### Paralegal

155. Nancy Nicklies has a Bachelor of Arts degree in sociology and a certificate from the American Institute for Paralegal Studies. Starting in 1987, Ms. Nicklies taught the inmate law clerks using the Uniform Law Clerk Training Program designed by Dr. Eimermann. She taught the class three times.

156. Julie Terlep replaced Ms. Nicklies as the paralegal at Dwight in February, 1992. She had been a paralegal for six weeks at the time she testified. She has a Bachelor of Arts degree from Eastern Illinois University and a certificate in paralegal studies from the American Institute for Paralegal Studies.

157. The paralegal supervises the inmate law clerks. The paralegal at Dwight at the time the trial began, Ms. Nicklies, reviewed the clerks' projects as they were completed

---

**43.** The paralegal testified that as of April, 1991, the Prison Review Board requires that all clemency petitions be typed.

and assisted them when they encountered problems. Although Ms. Nicklies also testified that she could not give legal advice or prepare legal documents because she was not working under the supervision of an attorney, she gave numerous examples of advice that she gave inmates. (Tr. 4132, 4134, 4140.) Her advice seemed appropriate in those examples. Although she is not supervised by an attorney, the evidence indicated that Ms. Nicklies obtained legal advice from an attorney with CLAIM and that she attended legal seminars.

158. The paralegal goes to the segregation unit about once a week and is permitted to visit as often as she wants.

### Inmate Law Clerks

159. At the time of trial, there were two inmate law clerks and one trainee. The number of law clerks tends to vary from two to three and there is a fair amount of turnover in the position. The paralegal interviews prospective clerks and makes a recommendation to the Educational Administrator, who then interviews the applicants and makes the final recommendation. The warden gives final approval on recommendations. Each inmate clerk works five days per week from 8:00 a.m. to 3:00 p.m.

160. At the beginning of the trial, the inmate law clerks were Eriabee Chiles and Rochelle Crum. During the course of the trial, Ms. Chiles was transferred to another institution and was replaced by Mary Nelson. Ms. Chiles began taking the Eimermann law clerk training program (which she finished) at the time she began working as a law clerk. She also has a bachelor's degree in sociology from Roosevelt University and attended law school for two months. The record does not include information on Ms. Crum's education. Ms. Nelson had spent two years in college at the University of Minnesota before coming to Dwight.

161. The DOC has a contract with Lewis University to teach Paralegalism I and II, the courses used to train the law clerks. The EIMERMANN UNIFORM LAW CLERK TRAINING

BOOK is used. Ms. Nicklies worked with Lewis University to ensure that inmates received adequate library time and appropriate training.

162. Since inmates in segregation are not permitted to go to the library, they are dependent on inmate law clerks and the civilian paralegal. Segregation inmates can request assistance by speaking to the law clerks or paralegal when they are in the unit or they can send a referral to the law library. They can also ask the panel officer to contact the law library.

163. The inmate law clerks are scheduled to visit the segregation unit on Mondays, Tuesdays and Thursdays. They speak to inmates and deliver papers through food slots in the solid doors. When the law clerks enter the segregation unit, they announce their presence.

164. Ms. Nicklies testified that inmates generally draft their own petitions, but the law clerks draft complaints when help is needed. The clerks do not write briefs or memoranda of law. Ms. Nelson, a law clerk, testified that more inmates requested assistance than she was able to help. She also testified that the new paralegal, Ms. Terlep, told her that she could only assist an inmate whose TABE score was below the sixth grade. Ms. Nelson also testified that she requested advice from Ms. Terlep on two occasions because inmates wanted to file a Section 1983 complaint against prison officials, but that Ms. Terlep refused to discuss any suit against a staff member. It appears, however, that these inmates were not in segregation. I also note that Ms. Nelson's testimony includes inconsistencies with other evidence on a number of different issues.[44] Accordingly, I give it little weight.

165. Plaintiffs assert that the amount of time that the law clerks spend in segregation is so short that adequate legal access could not possibly be provided. However, Ms. Chiles testified that the law clerks may stay on the segregation wing as long as they wish. Furthermore, plaintiffs did not elicit testimo-

---

44. On this issue, there was no contradictory testimony, but it came in on rebuttal, after Ms. Terlep had testified.

ny from any inmate which indicated that her communications with a law clerk were cut short because of external time constraints imposed by defendants.[45]

### Provision of Legal Materials

166. Most legal materials are not allowed out of the library, but copies are furnished on request at five cents per page.[46] If an inmate has no funds and she has a deadline, copies are furnished at no charge. In addition, the library staff will photocopy any non-circulating materials upon an inmate's request. The inmate can keep the copies as long as she wants and there is no charge for their use if she returns them undamaged. Inmates are also allowed to keep papers and pens in their cells. They can obtain these materials from the commissary or the paralegal will furnish them on request.

167. Some materials are allowed out of the library and in segregation, such as the department rules, Chapter 38, BARRON'S LAW DICTIONARY, the PRISONERS' SELF-HELP LITIGATION MANUAL and another book on prisoner's rights. Ms. Nicklies testified that inmates generally know about the department rules and Chapter 38. She testified that their knowledge about other books is limited. Segregation inmates may obtain a list of books available in the law library by requesting it from officers in the segregation unit. It is not clear, however, that all inmates are aware that the list exists.

168. In addition to being able to ask for copies of specific legal materials that the inmate knows exists, the inmates can present their particular problem to the inmate law clerks. The law clerks will give the inmate books and materials that address the problem.

### Additional Sources of Legal Assistance

169. The Legal Assistance for Prisoners Project was started to furnish legal assistance to Dwight inmates. Sally Elison is the only attorney working for the project and she works only half-time. Inmates must fit within very narrow guidelines to be eligible for her services. She helps only inmates who are residents of Chicago, she does not handle criminal matters, and she does not take cases related to conditions of confinement. Ms. Nicklies testified that she understood that the Project is currently out of money.

170. Attorney Gail Smith, the director of Chicago Legal Assistance to Incarcerated Mothers ("CLAIM"), testified that CLAIM provides limited assistance to inmates at Dwight. CLAIM assists only inmates from Cook County and deals only with legal problems related to family law issues. Ms. Smith testified that she is able to help only about one in three inmates requesting assistance because of the organization's limitations. CLAIM often hears from inmates with complaints relating to medical care and other conditions of confinement but does not accept such cases. CLAIM has not been generally successful in referring these women to other agencies or private attorneys.

### CONCLUSIONS OF LAW

1. In considering plaintiffs' motion for a preliminary injunction, Judge Moran found that the system utilized by defendants did not allow plaintiffs direct access to law libraries, consisted principally in the utilization of inmate law clerks who acted as "runners" to bring legal materials to inmates in segregation, did not provide adequate training to the law clerks, limited the number of photocopies that an inmate could receive in a year, limited the amount of paper given to inmates, and restricted telephone communications with at-

---

**45.** One inmate, Lisa Forbes, who was in segregation from June, 1989 through September, 1990, testified that during that period she asked to see a law clerk approximately 15 times and was only visited three times. I did not find Ms. Forbes' testimony to be credible.

**46.** At trial, Ms. Terlep testified that she had established a new policy allowing segregation inmates to have books in their cells. The testimony did not indicate which books were included in

this policy. The testimony—and apparent change in policy—is another example of a problem that occurred frequently during this trial and that has been noted at various times in this opinion: a long-standing policy or practice was suddenly changed on the eve of, or in the course of, trial. Under the circumstances, I am unable to assume that the change represents an ongoing condition at Dwight.

torneys. Based on these facts, Judge Moran concluded that plaintiffs had been denied access to the courts required by the U.S. Supreme Court in *Bounds v. Smith, supra,* 430 U.S. 817, 97 S.Ct. 1491.[47]  *Walters v. Thompson,* 615 F.Supp. 330, 339 (N.D.Ill.1985). In so holding, Judge Moran noted that systems relying entirely on inmate runners had been repeatedly held unconstitutional. *Id.* In the present case, that system was exacerbated by the other practices alleged to exist.

■ 2. Judge Moran's conclusions were based on affidavits alone. There has now been a lengthy trial and my conclusions necessarily must be based on the facts as found at trial. Nevertheless, the beginning point for analysis now (as on the motion for a preliminary injunction) is *Bounds v. Smith, supra.* In *Bounds,* the Supreme Court held that "the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." 430 U.S. at 828, 97 S.Ct. at 1498. The right of access to the courts is embodied in the guarantee of due process because prisoners must "be afforded access to the courts in order to challenge unlawful convictions and to seek redress for violations of their constitutional rights." *Procunier v. Martinez,* 416 U.S. 396, 419, 94 S.Ct. 1800, 1814, 40 L.Ed.2d 224 (1974). *Accord, Wolff v. McDonnell,* 418 U.S. 539, 579, 94 S.Ct. 2963, 2986, 41 L.Ed.2d 935 (1974). The Seventh Circuit has noted that the right of access to the courts is the most fundamental right that an inmate holds. *DeMallory v. Cullen,* 855 F.2d 442, 446 (7th Cir.1988).

■ 3. "[T]he Constitution protects with special solicitude, a prisoner's access to the courts." *Davidson v. Scully,* 694 F.2d 50, 54 (2d Cir.1982); *Sostre v. McGinnis,* 442 F.2d 178, 189 (2d Cir.1971) *(en banc), cert. denied sub nom., Oswald v. Sostre,* 405 U.S. 978, 92 S.Ct. 1190, 31 L.Ed.2d 254 (1972). "All other rights of an inmate are illusory without it, being entirely dependent for their existence on the whim or caprice of the prison warden." *DeMallory v. Cullen, supra,* 855 F.2d at 446 (quoting from *Adams v. Carlson,* 488 F.2d 619, 630 (7th Cir.1973)). Consistent with this protection, the burden is on the state to show that its assistance to inmates is adequate to enable inmates to prepare and file meaningful legal papers. *Alston v. DeBruyn,* 13 F.3d 1036, 1041 (7th Cir.1994); *DeMallory v. Cullen, supra,* 855 F.2d at 446; *Caldwell v. Miller,* 790 F.2d 589, 606 (7th Cir.1986). *Accord, Casey v. Lewis,* 43 F.3d 1261, 1266 (9th Cir.1994), *cert. granted,* — U.S. —, 115 S.Ct. 1997, 131 L.Ed.2d 999 (1995).[48]  Access to the courts means the ability to file a legally sufficient claim, or as stated by one court, "getting the courthouse door opened in such a way that it will not automatically be slammed shut." *Knop v. Johnson,* 977 F.2d 996, 1006–07 (6th Cir.1992), *cert. denied sub nom., Knop v. McGinnis,* — U.S. —, 113 S.Ct. 1415, 122 L.Ed.2d 786 (1993).

■ 4. Defendants argue that plaintiffs may only proceed if they have proved that they lost a case or were unable to file a case as a result of defendants' actions. A number of Seventh Circuit decisions have held that an inmate must show "some quantum of detriment caused by the challenged conduct." *Alston v. DeBruyn, supra,* 13 F.3d 1036, 1041 (quoting from *Shango v. Jurich,* 965 F.2d 289, 291 (7th Cir.1992)). The court has

47. Judge Moran did not issue a preliminary injunction because insufficient facts had been presented with respect to several of the institutions involved in this lawsuit and because there had been no evidentiary hearing on the motion. Accordingly, he decided that the balance of hardships rested with defendants since the relief would require major institutional changes at each institution.

48. Defendants argue that the plaintiffs bear the burden of proving the provision of meaningful assistance. In support of their position, defendants rely on statements in several Seventh Circuit cases, including *Alston v. DeBruyn, supra,* that say that an inmate must show that prison officials have failed to provide adequate assistance. See 13 F.3d at 1040–41. In addition to this statement, however, *Alston* reiterated previous Seventh Circuit holdings that "defendants ... bear the burden of proving the adequacy of the means provided." *Id.* at 1041. I conclude that defendants bear the burden of proof, as the Seventh Circuit has clearly stated.

also held that the "showing of detriment is waived, however, where the inmate alleges 'a direct, substantial and continuous, rather than a "minor and indirect" limit on legal materials.'" *Alston v. DeBruyn, supra,* 13 F.3d at 1041 (quoting from *DeMallory v. Cullen, supra,* 855 F.2d at 448–49). As a practical matter, it must often be impossible for an inmate to prove that he would have won his case or at least would have been able to bring a meaningful claim if he had had the access to the courts that he is claiming he lacked. The Supreme Court in *Bounds v. Smith* noted that inmates without meaningful access may not know "whether they have claims at all." *Bounds v. Smith, supra,* 430 U.S. at 826 n. 14, 97 S.Ct. at 1497 n. 14. In this case, Judge Moran similarly commented

> that inmates may need to have access to legal resources in order to learn that they have a colorable claim as well as to frame a cause of action. A requirement that inmate plaintiffs be thwarted in their active pursuit of an existing lawsuit before they can bring an access-to-court claim assumes a degree of access to legal resources that may not exist.

*Walters v. Thompson, supra,* 615 F.Supp. at 338. The Supreme Court in *Bounds* added:

> [A] lawyer must know what the law is in order to determine whether a colorable claim exists, and if so, what facts are necessary to state a cause of action. If a lawyer must perform such preliminary research, it is no less vital for a pro se prisoner. Indeed ... it is often more important that a prisoner complaint set forth a nonfrivolous claim meeting all procedural prerequisites, since the court may pass on the complaint's sufficiency before allowing filing in forma pauperis and may dismiss the case if it is deemed frivolous.... Moreover, if the State files a response to a pro se pleading, it will undoubtedly contain seemingly authoritative citations. Without a library, an inmate will be unable to rebut

the State's argument. It is not enough to answer that the court will evaluate the facts pleaded in light of the relevant law. Even the most dedicated trial judges are bound to overlook meritorious cases without the benefit of an adversary presentation.

430 U.S. at 825–26, 97 S.Ct. at 1496–97.

■ 5. The purpose of the detriment requirement is to be certain that there is a controversy.[49] *Hossman v. Spradlin,* 812 F.2d 1019, 1022 n. 5 (7th Cir.1987). Accordingly, most courts have found that an allegation of need for a particular purpose satisfies the detriment requirement. In *Petrick v. Maynard,* 11 F.3d 991, 996 (10th Cir.1993), for example, the Tenth Circuit held that a prisoner alleging a need for particular materials must articulate a need for the requested material with sufficient particularity so that the need could be measured against legitimate penological concerns. The Court emphasized, however, that the prisoner need not prove the materiality of the items sought since that "will often be impossible." *Id.*

6. Defendants' argument must be rejected in this case for two additional reasons. First, the Seventh Circuit has specifically held that

> when an inmate complains of prison rules that substantially and continuously limit his or her access to legal materials and counseling, the complaint carries an inherent allegation of prejudice.

*DeMallory v. Cullen, supra,* 855 F.2d at 449. The complaint in this case, and the proof, concern specific prison rules that continuously restrict plaintiffs' access to legal materials and assistance in presenting claims to the courts. Plaintiffs allege that the restrictions are so substantial that they violate their constitutional rights under *Bounds.* As discussed below, I conclude that the restrictions do substantially restrict plaintiffs' access to the courts at three of the institutions in-

---

**49.** However, both the Seventh Circuit and the Supreme Court have treated this issue liberally. For example, in *Buise v. Hudkins,* 584 F.2d 223, 227 (7th Cir.1978), *cert. denied,* 440 U.S. 916, 99 S.Ct. 1234, 59 L.Ed.2d 466 (1979), a prisoner "jailhouse lawyer" was found to have standing to raise the claims of other prisoners concerning access to the courts. The Seventh Circuit relied on *Johnson v. Avery,* 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969), in which the Supreme Court had allowed a "jailhouse lawyer" to assert a denial of access to the courts on behalf of his fellow prisoners.

volved in this case. Accordingly, the plaintiffs have met their burden in this regard.

7. Plaintiffs have done more than allege a substantial and continuous limit on their access to legal materials and assistance. Numerous witnesses, including the DOC Library Services Coordinator, testified that the assistance currently provided inmates is inadequate. Another of defendants' witnesses, a paralegal at one institution, testified that inmates at his institution who needed help, and were in many cases illiterate, were not getting help. A law clerk at Joliet also testified that he did not even have sufficient time to respond to all requests for materials from inmates in segregation. Finally, numerous members of the plaintiff class testified that they were unable to adequately present claims. Having listened to the testimony and reviewed pleadings filed by some of the inmates, I find this testimony to be credible. Thus, plaintiffs have shown a detriment.

8. It is undisputed that plaintiffs do not have direct access to a library. Those plaintiffs who are incarcerated at Menard are allowed in the library, but they are restricted to study cages where they must rely upon inmate law clerks to bring materials to them. They cannot browse among the books. At the other institutions involved in this case, inmates are confined to their cells in segregation. They may see and use only those legal materials which are brought to them by inmate law clerks or library personnel.

■ 9. Where inmates are not provided with access to a law library, the inquiry is whether prison officials are providing "adequate assistance from persons trained in the law." *Bounds v. Smith, supra*, 430 U.S. at 828, 97 S.Ct. at 1498. *Accord, e.g., Casey v. Lewis, supra*, 43 F.3d at 1267 ("For those inmates deemed security risks and denied access to the library, *Bounds* requires the State to provide legal assistance."). *Bounds* suggested that this could be achieved by the training of inmates as paralegal assistants to work under lawyers' supervision,

the use of paraprofessionals and law students, either as volunteers or in formal clinical programs, the organization of volunteer attorneys through bar associations or other groups, the hiring of lawyers on a part-time consultant basis, and the use of full-time staff attorneys, working either in new prison legal assistance organizations or as part of public defender or legal services offices.

430 U.S. at 831, 97 S.Ct. at 1499. *Bounds* also noted the difficulties in a system dependent on inmate clerks, commenting that "[l]egal services plans not only result in more efficient and skillful handling of prisoner cases, but also avoid the disciplinary problems associated with writ writers, ..." *Id.* Nevertheless, the Court emphasized that it was not mandating one option, but rather, that the inquiry was whether a particular plan, evaluated as a whole, satisfied constitutional standards. *Id.* at 832, 97 S.Ct. at 1500.

■ 10. Despite the Court's recognition that an attorney or law student-assisted program had clear benefits,[50] it is clear that the Constitution does not require an attorney to assist an inmate in filing a claim. *E.g., Knop v. Johnson*, 977 F.2d 996, 1004–05 (6th Cir. 1992), *cert. denied,* — U.S. ——, 113 S.Ct. 1415, 122 L.Ed.2d 786 (1993); *Morrow v. Harwell, supra*, 768 F.2d at 623.

11. All of the institutions involved in this case attempt to satisfy *Bounds* through the use of inmate law clerks. *Bounds* contemplated that such clerks would work under the supervision of lawyers. *Bounds v. Smith, supra*, 430 U.S. at 831, 97 S.Ct. at 1499. Moreover, all courts considering the issue require that inmate clerks receive legal training. *E.g., Bounds, id.; Casey v. Lewis, supra*, 43 F.3d at 1267 (providing assistants without legal training "directly contravenes the rule set forth in *Bounds* that legal assistance must be provided by persons 'trained in the law'."); *Valentine v. Beyer*, 850 F.2d 951, 956 (3rd Cir.1988) ("An untrained legal

---

**50.** In addition to the above, the Court noted that "[i]ndependent legal advisors can mediate or resolve administratively many prisoner complaints that would otherwise burden the courts, and can convince inmates that other grievances against

the prison or the legal system are illfounded, thereby facilitating rehabilitation by assuring the inmate that he has not been treated unfairly." *Id.* at 831, 97 S.Ct. at 1499.

research staff is insufficient to safeguard an inmate's right of access to the courts.").

■ 12. It appears equally clear that a runner system alone, that is, a system in which law clerks serve as messengers only, bringing books to inmates who do not have access to a library, is not constitutionally adequate. *E.g., DeMallory v. Cullen, supra,* 855 F.2d at 447 (7th Cir.1988) ("[W]hen inmates have no access to a law library they must be provided with assistance by trained, skilled, and independent legal personnel") (quoting *Walters v. Thompson, supra,* 615 F.Supp. at 340); *Toussaint v. McCarthy,* 801 F.2d 1080, 1109–10 (9th Cir.1986), *cert. denied,* 481 U.S. 1069, 107 S.Ct. 2462, 95 L.Ed.2d 871 (1987). A runner system presents at least two problems. The first relates to the nature of legal research. As Judge Moran noted:

> Legal research often requires browsing through various materials in search of inspiration; tentative theories may have to be abandoned in the course of research in the face of unfamiliar adverse precedent. New theories may occur as a result of a chance discovery of an obscure or forgotten case. Certainly a prisoner, unversed in the law and the methods of legal research, will need more time or legal assistance than the trained lawyer in exploring his case. It is unrealistic to expect a prisoner to know in advance exactly what materials he needs to consult.

*Walters v. Thompson, supra,* 615 F.Supp. at 339 (quoting from *Williams v. Leeke,* 584 F.2d 1336, 1339 (4th Cir.1978), *cert. denied,* 442 U.S. 911, 99 S.Ct. 2825, 61 L.Ed.2d 276 (1979). *Accord, Toussaint v. McCarthy, supra,* 801 F.2d at 1109–10; *Morrow v. Harwell, supra,* 768 F.2d at 623 ("Even a quick research project by a trained lawyer may require reference and cross reference to numerous volumes"). Likewise, Judge Shadur explained:

> [A]s anyone who has done legal research knows, it is essential to have free access to the books to know just which ones you

really need. No one—even the most skilled legal scholar—can work effectively by having to designate *in advance* precisely which books (or which pages) are needed, then having those books (or pages) brought to the individual, then designating other books (or pages) as a result of reviewing the first designation, and so on. Even if an inmate were sophisticated and attuned to the nuances of legal meaning, the limitations imposed by defendants would convert the possible work of minutes into a need to spend hours—and, moreover, hours to which no plaintiff could gain access.[51]

*Williams v. Lane,* 646 F.Supp. 1379, 1389 (N.D.Ill.1986), *aff'd,* 851 F.2d 867 (7th Cir. 1988), *cert. denied,* 488 U.S. 1047, 109 S.Ct. 879, 102 L.Ed.2d 1001 (1989).

■ 13. A runner system is even less adequate to meet the needs of illiterate prisoners. For these inmates, "as a practical matter, there can be no meaningful access to the judicial system unless some literate person is available to reduce their stories to intelligible written pleadings." *Knop v. Johnson, supra,* 977 F.2d at 1006. As other courts have noted, "[i]t goes without saying that 'a book and a library are of no use, in and of themselves, to a prisoner who cannot read.'" *Casey v. Lewis, supra,* 43 F.3d at 1267 (quoting from *Lindquist v. Idaho State Bd. of Corrections,* 776 F.2d 851, 855–56 (9th Cir.1985)). For this reason, numerous courts have held that meaningful access to the courts requires assistance to illiterate inmates in researching and drafting pleadings regardless of whether the inmates have access to a library. *E.g., Casey v. Lewis, supra* (requiring sufficient legal assistants under organized plan for functionally illiterate inmates and inmates in segregation); *Knop v. Johnson, supra* (requiring paralegal rather than inmate help for inmates needing assistance); *Valentine v. Beyer, supra* (affirming injunction that prevented prisons from substituting messenger service for paralegal system); *Cruz v. Hauck,* 627 F.2d 710, 721 (5th

---

**51.** Judge Shadur made these comments in connection with the study cages available at Stateville, to which protective custody inmates, like those in segregation, have access. Judge Shadur

concluded that this system denied plaintiffs their right to meaningful access to the courts under *Bounds.* 646 F.Supp. at 1407.

Cir.1980) ("Library books ... cannot provide access to the courts for those persons who ... are illiterate." The issue under *Bounds* is meaningful access); *Walters v. Thompson, supra.*

14. Defendants argue that the Seventh Circuit has nevertheless upheld the constitutionality of a runner system alone under *Bounds,* citing *Caldwell v. Miller,* 790 F.2d 589 (7th Cir.1986), and *Campbell v. Miller,* 787 F.2d 217 (7th Cir.1986), *cert. denied,* 479 U.S. 1019, 107 S.Ct. 673, 93 L.Ed.2d 724 (1986). Neither opinion so holds, as the Seventh Circuit clearly stated in *DeMallory v. Cullen, supra,* 855 F.2d at 447.[52] Each involved the United States Penitentiary at Marion, Illinois. At the time, Marion was the highest level maximum security prison in the federal system. For security reasons, officials at Marion instituted a two-part system of access to legal materials. The system relied in part on a runner system, in which an inmate could request specific materials which would be delivered to his cell. But the inmates also had direct access to a small library, containing many reference materials, including the UNITED STATES CODE ANNOTATED, the CRIMINAL LAW REPORTER, and numerous prisoners' rights manuals, as well as other books. See Appendix to *Caldwell v. Miller, supra,* 790 F.2d at 610–11. The Seventh Circuit concluded that the combination of a direct access limited library and supplemental access to any specific materials not available in the direct access library was constitutional under the facts of those cases. Neither case presented an issue as to whether the inmates involved could read or understand the materials.

15. More recently, the Seventh Circuit reversed the dismissal of a case alleging denial of access to the courts. *See Alston v. DeBruyn, supra,* 13 F.3d 1036. In holding that the district court had erred in implying "that the constitutional requirement is met whenever an inmate is given any time in a law library," the Seventh Circuit emphasized that the "touchstone is 'meaningful' access, not just access." *Alston v. DeBruyn, supra,* 13 F.3d at 1041 (quoting from *Bounds v. Smith, supra,* 430 U.S. at 823, 97 S.Ct. at 1495).

16. Applying these principles to the present case, I conclude that the system of inmate assistance utilized by the Illinois Department of Corrections for inmates in segregation at Menard, Pontiac and Joliet maximum security prisons cannot withstand constitutional scrutiny. The evidence showed that segregation inmates are dependent on law clerks, who essentially act as runners in each of these prisons.

17. At Joliet, there are between 90 and 100 inmates in segregation at any time. They are not allowed to go into the library. One to three law clerks, a paralegal, and a librarian serve the 1,300 inmates at Joliet, including the inmates in segregation.[53] During the trial, both the librarian and paralegal quit. The law clerks are not required to have, and at least one did not have, any legal training at the time they begin their jobs. The law clerk acts as a runner for inmates in segregation, having no time to do more than fill requests for legal materials, and at times insufficient time to even take all requests. There was also evidence that noise would prevent inmates from discussing problems with law clerks if they wanted to attempt to get any legal advice, and that guards would be standing nearby.

18. In addition, the library at Joliet also appears to be inadequately maintained in that missing volumes are replaced only once a year. DOC officials testified that regularly missing volumes included the Illinois Criminal Code and the volume containing 42 U.S.C. § 1983. Inmates may well be responsible for taking the missing volumes, although there was no evidence to that effect and it is possible that inmates are not re-

52. In *DeMallory,* the Seventh Circuit also differentiated the justifications for the severe restrictions found acceptable at Marion ("the highest level maximum security prison in the federal penitentiary system," of which the "control unit" was for even more difficult inmates") from other maximum security facilities, including the segregation units at those facilities, such as the unit at issue in *DeMallory.* 855 F.2d at 447 n. 1. The facilities in question in this case are comparable to the Wisconsin institution in *DeMallory.*

53. During part of the trial, there was only one law clerk serving the entire institution.

sponsible. At any rate, each plaintiff's right of access to the courts is individual, and therefore a plaintiff cannot be prevented access by the theft, if it occurs, of others. I conclude that defendants' efforts to make available substitute materials [54] or to reorder materials have not been shown to be adequate to ensure plaintiffs' reasonable access to the courts.

19. The library has other problems. Until the eve of trial, the library did not even keep a list of forms available to prisoners. Although a list of available forms was eventually developed, inmates in segregation may not receive the list.

20. The problems of access for inmates in segregation at Pontiac are equally severe. Until the eve of trial of this case, Pontiac's nearly 2,000 inmates were served by three or four inmate law clerks and a paralegal who worked part of the time in another prison. Although segregation inmates are not allowed in the library, the DOC maintained no documented schedule showing visits to segregation by law clerks until shortly before trial. The law clerks and paralegal agreed that they were unable even to fill legal requests for everyone who had requests for books and materials; they did not have time to provide additional assistance for those in need. The paralegal testified that the number of inmate law clerks was insufficient and that he had repeatedly sought to hire more clerks. While the law clerks had received training, the only teacher who testified said that the clerks did not understand the course and would be unable to provide assistance in crucial areas. In addition, there was evidence that officials harassed law clerks in an attempt to discourage them from giving even the little help they could give.

21. Pontiac's library is also deficient in that it does not contain an annotated version of 42 U.S.C. Considering that the vast majority of inmate lawsuits—at least those in federal court—are filed pursuant to 42 U.S.C. § 1983, a copy of the statute that includes case citations would appear to be a basic research tool.

22. At Menard, there was only one law clerk to serve between 270 and 300 inmates in segregation at the time this case went to trial, despite the fact that six years had elapsed between the time Judge Moran found that the DOC's practices at Menard violated plaintiffs' rights to access to the courts and the time of trial. Although one additional law clerk was assigned to segregation at the time of trial, there were only five law clerks to serve the entire prison population,[55] and the DOC itself agreed that there needed to be between 10 and 20 clerks. The law clerk or clerks assigned to segregation visited segregation but twice a week and took orders for materials. Although the clerks were ostensibly under the supervision of a paralegal, there was no paralegal for nearly eight months in the year before trial. The only paralegal hired subsequently quit during trial and was not replaced for several months. At any rate, the paralegal did not know what the law clerks were doing, and he understood that he could not give legal advice, conduct research or prepare pleadings. He also did not know basic information about various forms. Although inmates were allowed to go to study cages within the library, an inmate might be able to use a case for only two hours in a period of weeks unless he had a documented deadline. Time in the study cages was limited to two-hour segments (which might be cut short) even for those with documented deadlines, a time too short to engage in much research.[56] Until a new directive was issued at the end of trial, the official written policy forbade clerks from conducting research and drafting pleadings.

---

**54.** Although defendants say that they can obtain material from a missing volume by interlibrary loan (which takes 10 days), this requires that an inmate, or library clerk or paralegal, know exactly what to ask for. Much of the utility of these volumes is to enable someone to browse through the case summaries under headnotes following the statutes.

**55.** Several of these clerks were hired just before trial. These figures do not include law clerks assigned to service protective custody prisoners.

**56.** As any lawyer knows, some time is spent simply getting organized. *See also* the cases and quotations cited above with respect to the need for time to browse through materials to begin to formulate a theory and to understand applicable law and precedent.

In general, the clerks refrained from giving such assistance. Sometimes clerks did do research and draft pleadings. However, they were not supervised when doing so, and there was evidence that inmates were at times charged for the work. Furthermore, by the end of the trial, there were only three law clerks who regularly dealt with segregation inmates, and two of those had no legal training. (The third finished the course offered by defendants during trial.) Clearly, the number of law clerks was insufficient to enable the clerks to provide assistance beyond providing specific materials even if Menard had a program to provide assistance or supervision.[57]

23. Defendants did not provide convincing evidence that the law clerks at any of these facilities were "capable of helping any inmate draft a legal document." *Ramos v. Lamm*, 639 F.2d 559, 584 n. 29 (10th Cir. 1980), *cert. denied*, 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981). To the contrary, the evidence showed that law clerks frequently were assigned to assist inmates in segregation although they had never had legal training, that paralegals and librarians never reviewed documents drafted by the law clerks (and in some cases did not have the training to provide such review), and that even when law clerks took courses, their own teachers believed they could not understand the material.

24. At each of these institutions, the problems are compounded for nearly one third of the inmates by the fact that they are illiterate, *i.e.*, unable to read beyond the sixth grade level, a level that would not enable them to read or understand even the simplest legal material according to the expert testimony at trial.[58] Since one half of the inmates read at the eighth grade level or lower, the number who are unable to understand the material necessary to prepare or file a pleading sufficient to withstand a motion to dismiss is probably much greater than one third of the inmates. None of these institutions maintain any procedure to ensure that such inmates will be provided with the assistance they need to file a legally sufficient complaint or petition in court. These inmates do not have meaningful access to the courts.

### Dwight Correctional Center

■ 25. Dwight differs from the institutions discussed above not only in the fact that it houses female prisoners but also in its size. There are 662 prisoners at Dwight—not all of them maximum security—and of these there are between 29 and 48 inmates in segregation at one time. Unlike the segregation inmates at the men's prisons, those in segregation at Dwight generally remain there for short periods, although there are and have been prisoners in segregation for periods in excess of one year. Like those at the men's institutions, inmates in segregation at Dwight are not allowed access to a library. There are, however, two law clerks who go to segregation three times a week. They remain as long as they are needed and they provide substantive help. Furthermore, they have received legal training, and those who testified appeared to be better educated and have greater legal knowledge than the law clerks and some of the lay paralegals at the men's institutions.

26. In addition, the paralegal who worked at Dwight at the time the trial began appeared to provide real supervision to law clerks, reviewing their work, assisting them, and helping inmates directly. *Bounds* re-

---

57. After I had provided the parties with my proposed findings of fact and conclusions of law, the Seventh Circuit decided *Smith v. Shawnee Library System*, 60 F.3d 317 (7th Cir.1995). Defendants have not argued that *Smith* controls this case and I agree that it does not affect this decision. *Smith* did involve Menard, but was an individual action by a protective custody inmate. In addition, it was decided on summary judgment, rather than after a full trial on the merits. In the present case (apart from the other facts that I have found to exist), DOC witnesses them-

selves testified that the number of inmate law clerks was insufficient to provide adequate help to inmates.

58. As noted earlier, defendants argued that the evidence showed only a combined reading and mathematical score. The evidence was in their possession. They also bear the burden of proof. In addition, as noted in the Findings of Fact, the evidence indicates that if the inmates have a higher score in one area, it is in mathematics, not reading.

quires that inmate law clerks receive substantive supervision. I conclude that, at least at the time the trial began, law clerks at Dwight were receiving such supervision. The evidence with respect to the paralegal who replaced Ms. Nicklies is more tentative. She had been working at Dwight for too short a time to allow anyone to draw conclusions about her supervision and assistance to law clerks and inmates once she learned her job. It is also possible that she is no longer working at Dwight. Thus, based on the evidence before me, I conclude that Dwight has provided inmates with access to the courts as required by *Bounds*. However, this conclusion is necessarily limited to the conditions existing at the time of trial.[59]

27. Dwight is not a perfect model for access to the courts. The fact that inmates in segregation are receiving access to the courts did not appear to be the result of institutional procedures, but was instead the result of better educated clerks, the small number of women in segregation, the small number of women in segregation over a lengthy period of time, and a paralegal who tried earnestly to do her job. Dwight also has problems that have not been addressed. In particular, plaintiffs' evidence showed that some legal forms used at Dwight for child custody matters might actually prejudice an inmate. However, the access to courts required by *Bounds* does not extend beyond "constitutional rights and other civil rights actions related to [inmates'] incarceration." *Knop v. Johnson, supra,* 977 F.2d at 1009. Accordingly, while the evidence indicated that many of the legal problems of interest to women at Dwight concerned their children, they have no constitutional right to assistance from defendants in this area.

### Other Claims

28. Plaintiffs have raised other claims that can be discussed briefly and that may alleviate issues otherwise likely to arise in devising an appropriate remedy in this case. First, prisons are not required to provide inmates with typewriters. *See, e.g., Taylor v. Coughlin,* 29 F.3d 39 (2d Cir.1994). Second, although a former librarian testified in this case that paralegals and other civilian personnel would have greater independence if they were not on defendants' payroll, defendants are not required to take this step. *See, e.g., Knop v. Johnson, supra,* 977 F.2d at 1008.

### Relief

The parties agreed at trial that the question of remedy would be addressed separately if I found that any of the institutions did not meet the requirements of *Bounds*. For that purpose, counsel for the parties shall meet and attempt to agree on a special master to oversee a proposed plan. Together with the special master, counsel shall attempt to agree on a plan for each of the institutions that will bring these institutions into compliance with *Bounds* as soon as possible. If the parties cannot agree, the special master shall submit a plan, and counsel for either side may submit alternative plans.

---

59. It is also based on my assessment of the credibility of one inmate law clerk, Ms. Nelson. If, as Ms. Nelson testified, Ms. Terlep, or the current paralegal if someone has replaced Ms. Terlep, did refuse to provide supervision or refused to allow an inmate to help another inmate (or to receive assistance) on the basis that a TABE score was not less than a sixth-grade level, I would find that the inmate's rights of access to the courts were infringed. Since I did not find Ms. Nelson's testimony to be credible in general, and since this testimony was offered only in rebuttal and did not appear to involve segregation inmates, it does not affect my conclusion in this case. I simply note this fact to emphasize that my conclusion is based on my findings of fact on the specific evidence before me. Particularly in view of the many changes that defendants made at each of these institutions on the eve of trial in this case, there is no assurance that the conditions at Dwight will remain the same.